I have never been insensible to the grave responsibility I am obliged to assume in the judicial determination of proceedings of this nature. Superior considerations of public welfare and of personal liberty are normally implicated. A study of the relevant medical and legal literature seems in some cases to lighten but little the perplexities and uncertainties encountered in the undertaking to reach a righteous decision.
On December 9th, 1927, the person whose liberation is now sought was adjudged to be an insane person and thereupon committed to the New Jersey State Hospital at Trenton, where he continues to be confined. A writ of habeas corpus has been allowed upon the application of his aged mother, and testimony has been adduced before me relative to his existing mental state.R.S. 2:82-50 et seq.; N.J.S.A. 2:82-50 et seq. It is not inappropriate to realize that the specific statutory duty which devolves upon me is to "find and determine whether the person in whose behalf the writ was sued out, is sane or insane." *Page 372 
I have experienced no reason to desert the general convictions I expressed in a proceeding entitled In re Perry, 137 N.J. Eq. 161,162; 43 Atl. Rep. 885: "It is no less difficult to evolve a standard chart of behavior sufficient to justify the continued confinement of an alleged insane person than it is to precisely define insanity. Most of the attempts to define insanity are more sententious than definitive, sometimes leaving some shadowy margin between the perceptible boundaries of sanity and insanity.
"Psychiatry lies within the field of the specialist. His opinions are influential and serviceable, but it does not follow that every type of psychosis has the legal implication of insanity under the statute applicable to the immediate inquiry.
"Basically viewed, the power of the state to restrain insane persons and confine them in some asylum is an exercise of the police power deemed in its operation to be conducive to the public welfare. The motive supporting such legislation is the desire to protect the public or the person confined, or both. An unwarranted deprivation of personal liberty is more than unconscionable. The permanent incarceration of a sane person in such an environment without hope of release is probably little less punitive than a sentence of death.
"Therefore, differently expressed, I suppose the purpose of this inquiry to be to ascertain whether or not the mental condition of the patient is at present such that a continuance of his confinement is reasonably necessary to attain the objects of the statute. For that practical purpose it is not obligatory to declare what constitutes insanity in general, but rather to inquire wherein consists the alleged insanity of this particular individual."
And so in conformity, I shall briefly record my impressions of the evidence revelational of the mental state of Mr. R.R. on whose behalf the present inquiry is pursued.
In any case, the evidence, fairly, dispassionately, and impartially weighed and evaluated, constitutes the only solid foundation upon which a judicial decision can prudently be erected and sustained. Yet, in proceedings of the present class we are usually admonished to envision as well all of the grievous and lamentable consequences that might possibly *Page 373 
ensue from an erroneous release of the inmate whose mental competency is in issue. The argumentative proposal is that to remand is safe; to release is hazardous. The point constrains me to reply that timidity is not a desirable quality in a judge. I suspect that the timid too often see dangers which do not exist. In these cases I prefer to derive the prophecies from a logical analysis of the existing information. I apprehend that all such prognostications, whether deduced from the patient's past conduct or from a knowledge of psychiatry or from both, are nevertheless in some measure conjectural or theoretical.
This man will be 61 years of age next month. He has been involuntarily confined in the State Hospital since 1927 under the constant supervision and observance of attendants. I would suppose that the history of his deportment in the institution throughout that lengthy span of years would of itself supply a chronicle of his habits, propensities, and behavior abundantly informative of his alleged psychosis.
Significantly, the record of his institutional detention in the main subserves the application for his discharge. Evidently there has never been a single occurrence in which he has indulged in any act of violence of any character, or manifested an inclination to do so. He is classified as a quiet patient. Yet there is no representation of morosity. It is conceded that he is not afflicted with hallucinosis. Nor is it claimed that there is any generalized impairment of his memory, powers of comprehension, and intellect. He is not receiving any therapeutic treatment, and none is in contemplation. The unvarnished actuality is that this person is not a patient but a prisoner.
It is in such situations that I have steadfastly maintained that under existing legislation the lawmakers intended the judicial official to determine from the evidence adduced whether the mind of the inmate is so deranged and disordered that the public welfare or the welfare of the inmate requires his continued imprisonment, which inquiry impliedly encompasses the question whether, if liberated, the inmate in the light of the evidence is reasonably likely to menace the safety of himself or that of the person or property of others. *Page 374 
The right to imprison must emanate from the reasonable exercise of the police power. Therefore in the construction of the statute applicable to these remedial inquiries I decline to believe that the legislature intended to ordain the perpetual imprisonment of harmless and inoffensive individuals merely because they exhibit some type of psychosis catalogued in the science of psychiatry. I regard the word "insanity" in the section of the statute by which my action is governed in a proceeding of this nature as a social and legal rather than a medical term. Assuredly there are psychoneuroses and psychopathic states which are distinguished from insanity.
My hesitation to announce an immediate decision in this proceeding has not been attributable to any uncertainty in my mind concerning the intent of the statute or the applicable principles of justice, but rather to a very deliberate consideration of the following factual disclosures, which I shall summarize, and concerning which I shall comment briefly.
Mr. R.R. has been for many years and continues to be a prodigious reader and writer. Earlier in life he became engrossed in the study of the Christian religion, the Bible, and particularly in the personeity of Christ. His immersion in the subject seems to have been regarded by some as a wild fanaticism, and in July, 1915, he was committed to the State Hospital, from which he was discharged on or about November 1st, 1916. He deeply resented his commitment to the institution not only because of its consequential deprivation of his liberty, but also because of its depreciating reflection upon the purity and truth of the biblical interpretations and personal revelations which he felt inspired to disseminate.
His indignation gradually increased, and he composed and caused to be published in the newspapers certain articles sharply critical of those officially in charge of the institution. As previously noted, he was recommitted in 1927. This time he was initially and for some time lodged in the ward or building utilized for the detention of the criminal insane. The evidence does not indicate that he was accused or convicted of any criminal offense. It was represented that he had violated parole regulations. The evidence before me seems adequately to establish the falsity of that accusation. *Page 375 
He was, however, at that time adjudged to be insane. I am not authorized to review the propriety of that adjudication. My province is to determine whether in my judgment he is now insane.
While he was in the situation which I have last mentioned, he vehemently protested against the injustice which he declared had been visited upon him, and dispatched several letters of a sulphurous import to certain officials and to the press. He frankly acknowledges the communications and explains to me that in the circumstances he was at that time "mad" in the colloquial sense.
Social experience has taught us that allowances are made for the extravagances of temper and the faults of the tongue and pen in moments of intense excitement and passion. Whose liberty would be secure if all the loose and profane words uttered or written in the transient periods of irritation were to be accepted as cogent evidence of insanity, or of an atrocious nature, or of an evil heart?
During his confinement in the State Hospital this inmate completed the manuscript of his conception of the Christ entity, and it has been published by a New York publishing house and circulated in book form under the title Son of Man Revealed. I have examined it critically. While in my opinion the thoughts, ideas, and perceptions of the author might have been better marshalled and organized in the composition and while, like many expressions and shades of theological opinion, some of his conceptions are provocative of disputation, yet the bock is certainly not evidential of a debility of his mind.
Let me have him inform you in his own words of his inspiration and of his apprehensions by here inserting the following quotation from the introduction of his work:
"With Paul, I can truly say of the message that I am about to present: `I neither received it of man, neither was I taught it, but by the revelation of Jesus Christ.'
"I can also truly say that `woe is me' if I proclaim not the revelation that was made to me.
"What I am about to present to the world as a divinely inspired thought, that is destined to clarify and crystallize truly Christian thinking, is seemingly so simple that it will most probably seem to *Page 376 
many as something that cannot possibly be that great revelation which Christ promised should some day be made.
"Many others will probably actively oppose the spreading of the life-giving revelation because they lack the vision to see the dividing line which separates that which is sacred and beautiful from that which is vulgar and repulsive.
"But I am not going to allow this knowledge to keep me from proclaiming that which in my innermost being I am convinced is a most holy, and powerful, and beautiful truth; no matter how zealously and extensively the opposition weapons of ridicule, malice, and smug sanctimonious piety may be used against me."
Obviously and significantly, he anticipated some ridicule. It was at once forthcoming in the misrepresentation that he was endeavoring to prove that Christ was a female. The belief he clearly and unmistakably attempts to impart is that although Christ was a male in the flesh, the Christ in Spirit was in the image of God the embodiment of all the virtuous qualities of both man and woman, male and female. He avows that the Holy Trinity "consists of the Divine Father, the Divine Mother, and the indwelling Holy Spirit (True Love)." To keep a man in involuntary confinement for writing such an inoffensive book would be to resurrect a rejected and dusty relic of intolerance of an age long since past.
Why do the hospital authorities recommend the continued captivity of this inmate? I am told that in the deliberate opinion of the medical staff he is suffering from a "paranoiac condition." I wonder if the use of the word "condition" is intended to be qualifying and modulatory in its signification. I shall assume that paranoia is a chronic mental disorder characterized by systematized delusions of persecution and of one's own greatness. The persecution of which this man complains is not delusional and wholly imaginary in the sense that he misunderstands his security and falsely and without reason ascribes an imaginary insecurity to the hostility of non-existent or unknown persons or fanciful causes. The persecution of which he is conscious is not the delusion but the actuality that he is deprived of his liberty. He believes his incarceration to be unwarranted; hence he believes that in the real and actual circumstances he is a victim of persecution. *Page 377 
But it is emphasized that this man believes that he was particularly chosen by God to impart to humanity the theme of his book as a divine revelation. I desire only to state that there are perceptible dangers in undertaking in an atmosphere of mystery to allocate insanity according to the degrees of faith persons have in their God. The notion that for one to pray for enlightenment, advice, and guidance from God is perfectly rational but for one to believe implicitly that in response one receives them from God is a positive symptom of paranoia, is a doctrine I find myself unable to welcome. I recall that the first text book I consulted on theology was subdivided under the headings "Natural" and "Revealed." Is the cessation of divine revelations to be at last conclusively presumed?
It is now timely to describe the demeanor of Mr. R. at the hearing conducted by me in open court. He was noticeably composed, and he exhibited no manifestations of neuroticism or super-sensitive emotionalism. His remarks, freely permitted, were delivered by him with fluency and, save in one respect, in a temperate and sincere tone. He was extensively cross-examined by the capable Assistant Attorney-General whose interrogation of him was purposefully pursued with an antagonistic vigor in which counsel would not ordinarily indulge and which I would not permit except in a proceeding held solely to test the reactionary impulses of the witness. The latter fenced with his cross-examiner with notable craftiness.
The isolated and momentary instance in which he exhibited some excitability was occasioned by a statement of the medical director of the hospital who in his testimony related that he had been informed that the inmate on his prior commitment to the institution had violated his parole. Mr. R., seated in the courtroom, either did not hear the medical director qualify his statement as hearsay, or he inferred that the doctor intended to prejudice his cause falsely. In whatever aspect, the reference to that charge immediately reopened an old wound, and Mr. R. when invited to the witness chair declared that in reiterating such an assertion the doctor was a "liar," and that he despised liars. I cannot magnify that mere *Page 378 
incident beyond the limits of its significance. In the atmosphere of rivalry such explosive denunciations of an adverse witness sometimes detonate in a courtroom.
In conclusion, I acknowledge my inability to discover any evidence from which I can rationally infer that this man will, if liberated, suddenly engage in an act or acts of violence which will endanger his own safety or that of others. I can, however, be persuaded that his freedom is more likely to invigorate than to devitalize his inherent propensity to write. Nevertheless, I cannot confirm a continuance of his involuntary confinement for the sole object of silencing his pen.
It is therefore my conscientious judgment that this inmate is not insane within the import and meaning of the statutory issue which I am obliged to determine. If in the light of future eventualities my present decision should appear to be erroneous, I shall suffer the unpleasant sensations of one who has made an honest mistake but I shall, however, find some solace in the knowledge that I erred on the side of personal liberty.
An order directing the release of the inmate will be made.