IN THE MATTER OF J. W. FOR A WRIT OF *HABEAS CORPUS*. J. W., PLAINTIFF-RESPONDENT, v. DR. RUFUS R. LITTLE, AS SUPERINTENDENT OF BERGEN PINES HOSPITAL, DEFENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued March 4, 1957—Decided March 15, 1957.

Before Judges GOLDMANN, FREUND and CONFORD.

*Mr. Milton T. Lasher* argued the cause for defendant-appellant.

*Mr. Albert S. Gross* argued the cause for plaintiff-respondent (*Mr. Nelson G. Gross,* attorney).

The opinion of the court was delivered by

CONFORD, J. A. D. ██ We are concerned here with the legality of certain proceedings leading to the temporary confinement of a young woman, J. W., in the Bergen Pines County Hospital, a county institution, in June 1956. She was discharged on the return of a writ of *habeas corpus* by the Law Division, Bergen County, after a hearing. The defendant superintendent of the hospital appeals. The proceedings were instituted under *L.* 1953, *c.* 418, which contemplates admission of persons suffering from certain specified mental conditions for observation, for not exceeding seven days, excluding Saturdays, Sundays and holidays, and it is consequently argued, *inter alia,* that the appeal is moot. *Stizza v. Essex County Juvenile and Domestic Relations Court,* 132 *N. J. L.* 406 (*E. & A.* 1945). We are impressed, however, with the plea of the defendant that the cited enactment ought to have judicial interpretation for future guidance as a matter of public policy. We thus undertake consideration and determination of the merits of the case.

J. W. is 24 years of age and a college graduate. She is employed as a research assistant. Prior to the incident which gave rise to the present problem she had a history of psychiatric involvement, including several periods of hospital treatment, once for four or five months. Shortly prior to the hospitalization here brought in question a criminal complaint was filed against her in a municipal court for assault and battery and mayhem. The charge was based upon an alleged attack upon a female guidance officer in a public school. Contemporaneously a "Certificate of Physician" on a form self-described as "prescribed and approved by the State Department of Institutions and Agencies pursuant to Chap. 418, P. L. 1953" was signed by "Carl Wierum Physician" and "Lee Solworth, M.D. City Physician Englewood," and was used as a warrant for the taking of the plaintiff into custody at her home by a police officer and her confinement against her will in the Bergen Pines County Hospital. It was and is contended on her behalf that the certificate did not lawfully justify her forcible admission to

the institution, first, because the certifying physicians were not both in practice for five years, as required by *N. J. S. A.* 30:4–29, and second, because the plaintiff was not shown by the facts stated on the certificate or given in evidence at the hearing on the writ to have been in a condition which would evoke the operation of *L.* 1953, *c.* 418 (*N. J. S. A.* 30:4–46.1). The enactment reads:

"A person who upon examination by a duly licensed physician of this State shall be found to be suffering from a mental or nervous illness or from a psychosis caused by drugs or alcohol which renders him or her incapable of executing a voluntary application for admission to an institution maintained by the State or a county or a municipality treating such illness, may upon the certificate of such physician, the form whereof shall be approved by the Department of Institutions and Agencies, and in the discretion of the chief executive or other officer in charge of such institution, be admitted thereto for observation for a period not exceeding seven days, excluding Saturdays, Sundays and holidays, unless such person is thereafter detained under the authority of a formal commitment entered pursuant to the provisions of sections 30:4–23 to 30:4–48 of the Revised Statutes or other applicable statute."

It may be noted at the outset that the mechanism for institutional admission provided by the 1953 act is on its face of distinctly different import and purpose from the comprehensive legislative plan for judicial commitment of the insane to public institutions found in *N. J. S. A.* 30:4–23 to 48, which stems from *L.* 1918, *c.* 147. The latter creates and governs an "action for commitment" and requires a judicial hearing and order, although, in some classifications, temporary commitment may be had in advance of judicial action. The subject of the proceedings is a person alleged to be insane, and, on the institution of the action, there is required to be filed a certificate of the subject's insanity by two physicians, *under oath,* each of whom must have been engaged in the actual practice of medicine for at least five years. *N. J. S. A.* 30:4–29. Insanity in the sense of that statute means a condition of unsoundness of mind of such degree that if the afflicted person were allowed to be at large

he would be a danger to life, person or property or a menace to the public. *In re Heukelekian*, 24 *N. J. Super.* 407 (*App Div.* 1953). We may not lightly indulge the assumption that the legislative specification of only one certifying physician, without qualification as to period of practice, in the 1953 act, was undesigned. The differences in the criteria of the operative mental condition and in the period and purpose of confinement, as well as in respect to the non-judicial nature of the proceedings under the 1953 act as contrasted with those in an action for commitment, support a literal construction of the more recent statute. It did not matter that Dr. Wierum, as is conceded, had not been in practice five years.

But we have concluded that plaintiff is on firmer ground in her contention that a factual showing was not made in the physician's certificate warranting her detention under the act relied upon by defendant. The first paragraph of the certificate is by Dr. Wierum and he recites therein that he made a personal examination of J. W. and "found her to be suffering from a mental or nervous illness," *etc.*, following the precise verbiage of the statute, including the reference to a "psychosis caused by excessive use of drugs or alcohol." There is no compliance with the direction on the form: "(Physician should here specify exact condition observed by him together with a diagnosis)." Under Question 2, this information is given:

"Number of previous attacks, Not known; age at first attack, Not known; duration of present attack, . . . . . . . . . . .; (If the patient has ever been an inmate of an institution for the insane, state when and where), Bellevue Psychiatric—date 1954; Hartford Sanatarium—date 1952."

Under Question 6 appears the following:

"Is the patient violent, dangerous, destructive, excited or depressed, homicidal or suicidal? (If either homicide or suicide has been attempted or threatened it should be so stated.) Admits possible previous suicide attempt. Homicidal."

Under Question 7, the "supposed cause of the illness" is stated as "Homosexual girl being rejected by her lover." Supporting facts are specified as follows:

"The patient said * * *: I loved (my friend—a 40 yr old woman) and now she spites me. I don't know what I'll do now.
"The patient * * *: Neat—Agitated—Crying when speaking of her lover.
* * * * * * * *
"* * * I spoke to patient's alleged lover who showed me bite & bruise marks allegedly inflicted by patient."

At the hearing in the Law Division the plaintiff took the stand and was briefly interrogated by the court as to the circumstances of her detention and as to various facts relevant to her state of orientation. There was no medical testimony by either side. Neither of the certifying physicians was even in court. Defendant's counsel did offer in the course of colloquy to adduce the testimony of another physician who treated plaintiff at the hospital, but he never actually called him, apparently because the trial judge said: "I am interested in how she got in there, not what they did while she was there * * *." After an abbreviated cross-examination of plaintiff on behalf of defendant, the judge remarked:

"She seems to me to be fairly well oriented and she doesn't seem to me to be in any immediate danger either to herself or any other members of the community."

The order discharging the plaintiff finds that "the said [J. W.] has been since June 25, 1956 and still is illegally confined by reason of said certificate for temporary admission."

In determining whether the facts indicated made for the application of the act we first have to resolve matters of construction. Plaintiff argues that *chapter* 418 is invocable only where there is a voluntary commitment, relying upon the circumstance that the act has been allocated the designation "30:4–46.1" in the *Revised Statutes* compilatory scheme of title, chapter and section numbers, thereby placing it under the heading "C. Voluntary Applications," which

preceded *R. S.* Section 30:4–46 *et seq.,* in the *Revised Statutes of 1937,* and also upon the argument that the "less stringent" requirements of Chapter 418 may be inferred to have been intended solely for cases of voluntary applications, as contrasted with the stricter requirements of the lower numbered sections of Title 30, Chapter 4, generally made applicable in cases of involuntary commitment. But the position advanced cannot be sustained on the basis of either argument.

Written directly into the *Revised Statutes* when adopted in 1937 was the mandate that "the classification and arrangement of the several sections of the *Revised Statutes* have been made for the purpose of convenience, reference and orderly arrangement," and that "therefore no implication or presumption of a legislative construction is to be drawn therefrom." *R. S.* 1:1–5; *Asbury Park Press v. City of Asbury Park,* 19 *N. J.* 183 (1955). Headnotes are not part of the *Revised Statutes. R. S.* 1:1–6; *cf. State v. Burrell,* 120 *N. J. L.* 277, 282–284 (*E. & A.* 1938). Thus, if *L.* 1953, *c.* 418 had been incorporated into the *Revised Statutes* when first adopted in 1937 as section 30:4–46.1, the heading "C. Voluntary Applications" immediately antecedent to *R. S.* Section 30:4–46 could not have had any interpretative significance. *A fortiori* when the allocation of the post-revision compilation section number is by the Secretary of State under direction of the Law Revision and Bill Drafting Commission, albeit by legislative requirement. *L.* 1941, *c.* 19, and *L.* 1954, *c.* 28, amending *R. S.* 1:3–1. *Cf. Publix Asbury Corp. Inc. v. City of Asbury Park,* 18 *N. J. Super.* 286 (*Ch. Div.* 1951), affirmed on opinion below, 18 *N. J. Super.* 192 (*App. Div.* 1952). This is not to say, of course, that *L.* 1953, *c.* 418 should not be construed in the light of the legislative content proper of the provisions of the *Revised Statutes* to which we have referred, as being *in pari materia* with them (indeed we have done so above), nor that the title of *chapter* 418 is not a permissible guide to legislative intent. But there is no reference at all in the title to the voluntariness of an application.

■ And we do not agree that there is any other sound basis for plaintiff's contention that Chapter 418 applies only to voluntary applications. Plainly the very opposite is implied by the legislative prerequisite that the subject shall be found to be "incapable of executing a voluntary application for admission * * *."

■■ The foregoing conclusions do not, however, solve the problem of legislative intent. It is at least clear from the language quoted that the lawmakers had in mind a case where, because of the indicated psychotic conditions, the subject was unable to bring some degree of rational volition to bear upon the matter of a decision to seek admission to an institution for observation or treatment. Equally clear is the implicit assumption in the language that there may be people "suffering from a mental or nervous condition or from a psychosis caused by drugs or alcohol" who are not incapable of executing a voluntary application for admission. For them the act is not intended, nor, indeed, needed. It is only those in whom the indicated types of pathology have effected an incapacity for the exercise of volition who are to be subjects of the relatively informal procedure for temporary observational admission provided by *chapter* 418. So much decided, difficulty remains in attempting to draw the line for placing the situation of our subject, J. W. Defendant argues, and not without some cogency, that some individuals because of their condition are unable to exercise volition in such a matter in any responsible sense notwithstanding they may appear well oriented and rational on superficial observation; and that such persons may nevertheless be in need of the therapy which observation in a qualified institution would disclose to be indicated, and, therefore, within the legislative intent. It is argued that the physician's certificate establishes J. W. was in that category and that the Law Division should not have gone behind it. But, with all deference to the progressive scientific outlook in a most technical field underlying the argument, we are bound to seek the clearest legislative authorization before we can accord judicial sanction to the deprivation of

personal liberty in a given factual situation. See *In re Perry*, 137 *N. J. Eq.* 161, 164 (*Ch.* 1945).

██ It is to be conceded that the mere ability of a psychotic to mouth unwillingness to undergo institutional treatment would not necessarily evidence a case beyond the purview of the act. But it is reasonably to be inferred that in providing for the institutional admission of a person for up to seven days without the necessity of signification of consent of the subject or of any relative, on the unverified certificate of a single physician of an illness or psychosis rendering the subject "incapable of executing a voluntary application for admission," though with the discretionary consent of the hospital head, the Legislature was contemplating an individual mentally disoriented or disturbed, in a volitional sense, at least to a substantial degree. The quoted language would otherwise be meaningless. Even the mentally abnormal have the right of personal freedom, subject, of course, to the social interest in the confinement of those dangerous to themselves or others, in the exercise of the police power of the State. See *In re R. R.*, 140 *N. J. Eq.* 371 (*Ch.* 1947). The line cannot be drawn by specific formula. Each case must stand on its own feet.

 The medical certificate did not, in our judgment, contain facts adequate to establish, even *prima facie,* a mental condition indicating inability of the subject to exercise rational volition in the matter of submission to medical observation in a hospital. The hearing was confirmatory of this. Perhaps the woman needed such observation, medically. But it is for the Legislature to fix the conditions for imposing it *in invitum,* not the administrative authorities of the hospital, even though they were here unquestionably acting in good faith. Where the right of liberty is involved a reasonable doubt as to the applicability of the statute to the facts presented should be resolved in favor of the subject. See *In re Perry, supra* (137 *N. J. Eq.,* at *p.* 164) ; *cf. Boesch v. Kick,* 97 *N. J. L.* 92, 96 (*Sup. Ct.* 1922). Since the right to utilize the statute at all depended upon the sufficiency of the certificate, its failure to set forth facts tending to

show, or a justified conclusion that plaintiff's mental condition was that which the act, as we have construed it, contemplates for its invocation, affirmance of the order of discharge must follow.

Affirmed.