STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
STEFAN KROL, DEFENDANT-APPELLANT.

Argued February 18, 1975—Decided August 4, 1975.

240

*Mr. Michael C. Shale,* Assistant Deputy Public Defender, argued the cause for appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney; *Mr. Steven Zamrin,* Assistant Deputy Public Defender, of counsel and on the brief).

*Mr. William Welaj,* Deputy Attorney General, argued the cause for respondent (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Welaj* of counsel and on the brief).

The opinion of the Court was delivered by

PASHMAN, J. An acquittal on grounds of insanity, unlike a simple acquittal, does not automatically free the criminal defendant. The governing statute, *N. J. S. A.* 2A:163–3,[1] provides that if the jury finds the defendant not guilty by reason of insanity, it must then make a special finding as to whether defendant's "insanity continues"; if it finds that defendant's "insanity" does "continue," defendant is ordered confined to the Trenton Psychiatric Hospital "until such time as he may be restored to reason." This confinement is for an indefinite period of time, and may prove permanent, for "restoration to reason" requires not merely remission of acute symptoms but complete cure of the underlying illness or personality disorder. *State v. Maik*, 60 *N. J.* 203, 217–18 (1972). A lesser degree of improvement suffices to obtain for defendant only a "conditional release" subject to summary revocation by the court. *State v. Carter*, 64 *N. J.* 382 (1974). Defendant challenges the constitutionality of this involuntary commitment procedure.

Stefan Krol stabbed his wife to death in their home. He was indicted for murder and tried in the Superior Court,

---

[1] 2A:163–3. Acquittal on ground of insanity; findings; confinement
 If, upon the trial of any indictment, the defense of insanity is pleaded and it shall be given in evidence that the person charged therein was insane at the time of the commission of the offense charged in such indictment and such person shall be acquitted, the jury shall be required to find specially by their verdict whether or not such person was insane at the time of the commission of such offense and to declare whether or not such person was acquitted by them by reason of the insanity of such person at the time of the commission of such offense, and to find specially by their verdict also whether or not such insanity continues, and if the jury shall find by their verdict that such insanity does continue, the court shall order such person into safe custody and commit him to the New Jersey state hospital at Trenton until such time as he may be restored to reason.
 Although this case arises under *N. J. S. A.* 2A:163–3, the discussion also applies to *N. J. S. A.* 2A:163–2, which provides a procedure for establishing lack of guilt by reason of insanity where defendant is found not competent to stand trial. The commitment provisions of

Law Division in Camden County before a jury. Since he did not deny commission of the homicide, the only issue disputed at trial was whether he had been insane at the time of the act. Testimony of psychiatrists who had examined Krol before and after his wife's death indicated that he was suffering from an acute schizophrenic condition at the time of the killing, and acted under the influence of a powerful delusion that his wife was conspiring with his employer to murder him. The jury returned a verdict of not guilty by reason of insanity and found specially that defendant's insanity continued. Acting pursuant to *N. J. S. A.* 2A:163–3, the trial judge ordered defendant committed to the Forensic Psychiatric Unit at Trenton Psychiatric Hospital.

Defendant appealed the commitment order to the Appellate Division, which affirmed. We granted certification, 65

---

the latter statute are essentially identical to those found in *N. J. S. A.* 2A:163–3:

2A:163–2. Finding of insanity; disposition

If any person in confinement under commitment, indictment or under any process, shall appear to be insane, the assignment judge, or judge of the county court of the county in which such person is confined, may, upon presentation to him of the application and certificates as provided in Title 30, chapter 4 of the Revised Statutes, institute an inquiry and take proofs as to the mental condition of such person. * * * It shall be competent for the judge if sitting without a jury, or the jury, if one is impanelled, to determine not only the sanity of the accused at the time of the hearing, but as well the sanity of the accused at the time the offense charged against him is alleged to have been committed.

* * * * * * *

If it shall be determined after hearing as aforesaid, that the accused was insane at the time the offense charged against him is alleged to have been committed, the charge against him shall be dismissed on this ground and the records of the proceedings so noted. In this event, the judge or jury, as the case may be, shall also find separately whether his insanity in any degree continues, and, if it does, shall order him into safe custody and direct him to be sent to the New Jersey state hospital at Trenton, to be confined as otherwise provided by law, and maintained as to expense as is otherwise provided for the maintenance of the criminal insane, until such time as he may be restored to reason, and no person so confined shall be released from such confinement except upon the order of the court by which he was committed.

*N. J.* 561 (1974), to consider his contention that the standard for involuntary commitment of persons acquitted on grounds of insanity established by *N. J. S. A.* 2A:163–3 violates the due process and equal protection clauses of the fourteenth amendment to the federal constitution, a contention which we have not had occasion to consider in our prior decisions on this subject, *State v. Maik, supra,* and *State v. Carter, supra.*

I

Prior to considering the merits of this contention, we must first dispose of a procedural issue. On January 17, 1975, while the present matter was pending before this Court, the Camden County Court authorized the conditional release of defendant Krol, as permitted by our decision in *State v. Carter,* 64 *N. J.* 382 (1974). In granting the release, the court imposed a number of restrictive terms upon Krol: he must reside in a "Home for Sheltered Care" in close proximity to Ancora Psychiatric Hospital, continue psychiatric treatment as an outpatient, report regularly to a probation officer, and regularly inform the court of his condition; his freedom to travel is limited; and his release may be summarily revoked should he not comply with the terms of the conditional release order or should his condition change. Thus while the order released defendant from the physical custody of the State, it continues substantial restraints upon his liberty. Hence the principle, stated in *Stizza v. Essex County Juvenile & Domestic Relations Court,* 132 *N. J. L.* 406, 408 (E. & A. 1945), that commitment orders will not be reviewed after the person committed has been released and freed of all restraints upon his liberty and property does not govern this case. The present appeal is not rendered moot by the order for conditional release. Defendant still has a real and substantial interest in the validity of the original commitment order. *Cf. State v. Parmigiani,* 65 *N. J.* 154, 155 (1974); *Bower v. State,* 135

*N. J. L.* 564, 568–69 (Sup. Ct. 1947); *Sibron v. New York,*
392 *U. S.* 40, 50–59, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968).
Furthermore we have been informed by counsel that the
defendant has not been able to obtain a satisfactory half-
way house placement and has not in fact been released un-
der the terms of this order, although he has been allowed
a somewhat more limited conditional release under the
terms of an order of the Camden County Court dated August
1, 1975.

## II

■ Commitment following acquittal by reason of in-
sanity is not intended to be punitive, for, although such a
verdict implies a finding that defendant has committed the
*actus reus,* it also constitutes a finding that he did so with-
out a criminal state of mind. There is, in effect, no crime
to punish. *State v. Carter, supra,* 64 *N. J.* at 401; *State
v. Stern,* 40 *N. J. Super.* 291, 296 (App. Div. 1956). The
rationale for involuntarily committing such persons pursuant
to *N. J. S. A.* 2A:163–3 is, rather, to protect society against
individuals who, through no culpable fault of their own,
pose a threat to public safety. Chief Justice Weintraub
succinctly explained the purpose of this procedure in his
opinion in *State v. Maik, supra,* 60 *N. J.* at 213:

> For present purposes it is enough to say that all the doctrines
> which would excuse an offender from criminal accountability because
> of insanity have the common characteristic of attempting to dis-
> tinguish between the sick and the bad.
> \* \* \* \* \* \* \* \*
> The point to be stressed is that in drawing a line between the sick
> and the bad, there is no purpose to subject others to harm at the
> hands of the mentally ill. On the contrary, the aim of the law is to
> protect the innocent from injury by the sick as well as the bad.

■ The anomaly of the procedure established by *N. J.
S. A.* 2A:163–3 is that although its ultimate object is to
protect society against certain individuals who may pose

special risk of danger, it does not at any point provide for inquiry by judge or jury into the question of whether the particular defendant involved in fact poses such a risk. The standard for commitment is simply that defendant's "insanity continues." The fact that defendant is presently suffering from some degree of mental illness and that at some point in the past mental illness caused him to commit a criminal act, while certainly sufficient to give probable cause to inquire into whether he is dangerous, does not, in and of itself, warrant the inference that he presently poses a significant threat of harm, either to himself or to others.[2]

The consequence of this procedure is that a defendant who, despite the fact he still suffers some degree of mental illness, poses no significant danger to society, may nevertheless be deprived of his liberty for an indefinite period of time because dangerousness is, in effect, presumed from continuing insanity. The problem is most acute when the offense which defendant has committed is one which, although violating social norm, did not itself involve dangerous be-

---

[2]Empirical studies indicate that, as a group, persons suffering from mental illness are, at most, only slightly more likely to commit harmful acts than the general population. *E. g.*, Guze, Goodwin & Crane, "Criminality & Psychiatric Disorder," 20 Arch. Gen. Psych. 583 (1969); Rappaport & Lassen, "Dangerousness — Arrest Rate Comparisons of Discharged Patients and the General Population," 121 *Am. J. Psychiat.* 776 (1965); Rappaport, "Dangerousness and the Mentally Ill Criminal," 21 *S. C. L. Rev.* 23, 27 (1968); *see generally, Szasz, Law, Liberty & Psychiatry,* 144 (1963). Even persons suffering from mental illness who have committed prior criminal acts have not been shown to be consistently substantially more dangerous than other persons suffering from mental illness. *E. g.*, Steadman, "Follow-up on Baxstrom Patients Returned to Hospitals for the Criminally Insane," 130 *Am. J. Psychiat.* 317 (1973); Steadman & Keveles, "The Community Adjustment and Criminal Activity of the Baxstrom Patients: 1966–1970," 129 *Am. J. Psychiat.* 304 (1972); Rubin, "Prediction of Dangerousness in the Mentally Ill Criminal," 27 *Arch. Gen. Psychiat.* 297 (1972). *See generally,* Diamond, "The Psychiatric Prediction of Dangerousness," 123 *U. Pa. L. Rev.* 439, 444–47 (1974).

havior. But even where, as in this case, the crime is a violent one, the procedure contains great potential for individual injustice.

This defect, which involves serious infringement upon personal liberty, is one of constitutional dimensions. Constitutional principles of due process require that any state action bear a reasonable relationship to some legitimate state purpose. In *Jackson v. Indiana,* 406 *U. S.* 715, 92 S. Ct. 1845, 32 L. Ed. 2d 435 (1972), the United States Supreme Court, applying this principle to involuntary commitment proceedings, held that the standard for commitment must bear a reasonable relationship to the ostensible purpose for which the individual is committed. That decision, which involved the commitment for incompetency to stand trial of a mentally deficient deaf-mute accused of armed robbery, did not restrict the purposes for which the state might involuntarily commit individuals accused of crime; it did require that the state tailor its standard for commitment to whatever purpose it was nominally attempting to advance. *Cf. Davy v. Sullivan,* 354 *F. Supp.* 1320, 1329–30 (M. D. Ala. 1973) (holding that persons confined as sexual psychopaths must be released if their confinement is not within the nominal purpose of the statute — protection of the public and treatment). Furthermore, the state must make a meaningful factual determination as to whether defendant actually meets the standard for commitment. *Jackson v. Indiana, supra* 406 *U. S.* at 738–39, 92 S. Ct. 1845; *Specht v. Patterson,* 386 *U. S.* 605, 87 S. Ct. 1209, 18 L. Ed. 2d 326 (1967); *Bolton v. Harris,* 130 U. S. App. D. C. 1, 395 *F.* 2d 642 (D. C. Cir. 1968) (commitment following acquittal by reason of insanity); *People v. McQuillan,* 392 *Mich.* 511, 529–34, 221 *N. W.* 2d 569, 577–79 (Sup. Ct. 1974) (same); *State ex rel. Kovach v. Schubet,* 64 *Wis.* 2d 612, 623, 219 *N. W.* 2d 341, 347 (Sup. Ct. 1974), appeal dismissed 419 *U. S.* 1117, 95 S. Ct. 799, 42 *L. Ed.* 2d 817 (1975) (same). The state

may not simply presume essential adjudicatory facts. *Cf. Cleveland Bd. of Ed. v. La Fleur,* 414 *U. S.* 632, 644–46, 94 S. Ct. 791, 39 L. Ed. 2d 52 (1974); *Vlandis v. Kline,* 412 *U. S.* 441, 446, 93 S. Ct. 2230, 37 L. Ed. 2d 63 (1972); *Stanley v. Illinois,* 405 *U. S.* 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); *Bell v. Burson,* 402 *U. S.* 535, 91 S. Ct. 1586, 29 L. Ed. 2d 90 (1971).

Since *N. J. S. A.* 2A:163–3 is designed to protect the public against the risk of future dangerous behavior by persons acquitted by reason of insanity who are still suffering from mental illness, *State v. Maik, supra,* the principles of due process enunciated in *Jackson* and like cases require that the standard for commitment be cast in terms of continuing mental illness and dangerousness to self or others, not in terms of continuing insanity alone, and that some trier of fact make a meaningful determination as to whether defendant is actually within these standards.[3]

---

[3]Since the purpose of *N. J. S. A.* 2A:163–3 has been held to be the protection of society from the "sick" as well as the "bad," a holding that the State does not challenge here, we need not consider whether principles of due process would bar the State in this context from imposing the massive, indefinite curtailment of personal liberty involved in involuntary commitment for any reason less compelling than protection of society against a substantial threat of conduct by the defendant dangerous to himself or others. *See e. g., State v. Caralluzzo,* 49 *N. J.* 152, 156 n. 1 (1967); *In re Heukelekian,* 24 *N. J. Super.* 407 (App. Div. 1953). We note that recent cases indicate a strong trend toward such a construction of the due process clause. *E. g., Davis v. Watkins,* 384 *F. Supp.* 1196, 1200, 1202 (N. D. Ohio 1974); *Bell v. Wayne County General Hospital,* 384 *F. Supp.* 1085, 1095–96 (E. D. Mich. 1974) (three-judge court); *Lessard v. Schmidt,* 349 *F. Supp.* 1078, 1093–97 (E. D. Wis. 1972) (three-judge court) vacated on other grounds and remanded, 414 *U. S.* 473, 94 S. Ct. 713, 38 L. Ed. 2d 661 (1974), judgment modified on other grounds and reinstated 379 *F. Supp.* 1376, 1379 (1974), vacated on other grounds and remanded 421 *U. S.* 957, 95 S. Ct. 1943, 44 L. Ed. 2d 445 (1975); *Dixon v. Attorney General,* 325 *F. Supp.* 966, 974 (M. D. Pa. 1971) (three-judge court); *In re Levias,* 83 *Wash.* 2d 253, 517 *P.* 2d 588 (Sup. Ct. 1973); *State ex rel. Walker v. Jenkins,* 203 *S. E.* 2d 353 (W. Va. Sup. Ct. 1974); *State ex rel.*

### III

This conclusion is also compelled by considerations of equal protection.

In *Baxstrom v. Herold,* 383 *U. S.* 107, 86 S. Ct. 760, 15 L. Ed. 2d 620 (1966), the Supreme Court held that prisoners who had allegedly developed mental illness while incarcerated and who were, as a result, being involuntarily committed to mental institutions, were entitled under the equal protection clause to substantially the same procedural protections as other persons subject to involuntary civil commitment. Among other things, *Baxstrom* held that the same standard for commitment to a particular mental institution had to be applied to prisoners and to other persons subject to involuntary civil commitment to that institution. Subsequently, in *Jackson v. Indiana,* 406 *U. S.* 715, 92 S. Ct. 1845, 32 L. Ed. 2d 435 (1972), the Court applied the principle of *Baxstrom* to persons determined to be incompetent to stand trial on criminal charges. It held that, except for a short observation period, a state cannot commit such a person unless it applies the same standards for commitment to him as it does to other persons involuntarily committed.

While neither of these cases deals specifically with the problem of involuntary commitment of persons acquitted by reason of insanity, the Supreme Court in these opinions has plainly attempted to enunciate a broad principle — that the fact that the person to be committed has previously engaged in criminal acts is not a constitutionally

---

*Hawkes v. Lazaro,* 202 *S. E.* 2d 109 (W. Va. Sup. Ct. 1974) ; *cf. O'Connor v. Donaldson,* 422 *U. S.* 563, 95 *S. Ct.* 2486, 45 *L. Ed.* 2d 396 (1975) ; *Gomez v. Miller,* 341 *F. Supp.* 323, 331–32 (S. D. N. Y. 1972) (three-judge court), aff'd mem. 412 *U. S.* 914, 93 S. Ct. 2737, 37 L. Ed. 2d 141 (1973) (dictum). *But cf. Fhagen v. Miller,* 29 *N. Y.* 2d 348, 328 *N. Y. S.* 2d 393, 278 *N. E.* 2d 615 (Ct. App. 1972) *cert.* denied 409 *U. S.* 845, 93 S. Ct. 47, 34 L. Ed. 2d 85 (1972).

acceptable basis for imposing upon him a substantially different standard or procedure for involuntary commitment. The labels "criminal commitment" and "civil commitment" are of no constitutional significance. In *Jackson v. Indiana, supra* at 406 U. S. 724–25, 92 S. Ct. 1845, the Supreme Court clearly indicated that it regarded this principle as one to be applied very broadly throughout the spectrum of various forms of involuntary commitment, including commitment of persons acquitted by reason of insanity.

The principles of *Baxstrom* and *Jackson* have been widely applied by the state courts and the lower federal courts to overturn procedures for involuntary commitment of persons acquitted by reason of insanity which deviate substantially from those applied to civil commitments generally. *E. g., Bolton v. Harris*, 130 U. S. App. D. C. 1, 395 *F.* 2d 642 (D. C. Cir. 1968); *Reynolds v. Neill*, 381 *F. Supp.* 1374 (N. D. Texas 1974) (three-judge court), vacated and remanded, *sub nom. Sheldon v. Reynolds*, 422 *U. S.* 1050, 95 S. Ct. 2671, 45 L. Ed. 2d 703 (1975); *State v. Clemons*, 110 *Ariz.* 79, 515 *P.* 2d 324 (Sup. Ct. 1973); *In re Franklin*, 7 *Cal.* 3d 126, 101 Cal. Rptr. 553, 496 *P.* 2d 465 (1972); *Mills v. State*, 256 *A.* 2d 752 (Del. Sup. Ct. 1969); *People v. McQuillan*, 392 *Mich.* 511, 221 *N. W.* 2d 569 (Sup. Ct. 1974); *State ex rel. Kovach v. Schubert*, 64 *Wis.* 2d 612, 219 *N. W.* 2d 341 (Sup. Ct. 1974), appeal dismissed 419 *U. S.* 1117, 95 S. Ct. 799, 42 *L. Ed.* 2d 817 (1975); *State ex rel. Walker v. Jenkins*, 203 *S. E.* 2d 353 (W. Va. Sup. Ct. 1974) (semble). *Cf. Commonwealth ex rel. DiEmilio v. Shovlin*, 449 *Pa.* 177, 295 *A.* 2d 320 (Sup. Ct. 1972). *See also Chase v. Kearns*, 278 *A.* 2d 132 (Me. Sup. Ct. 1971); *State v. Kee*, 510 *S. W.* 2d 477 (Mo. Sup. Ct. 1974).

In *Bolton v. Harris, supra,* the U. S. Appeals Court struck down the District of Columbia automatic commitment statute, holding, among other things, that the standard for involuntary commitment of persons acquitted by reason

of insanity must be substantially the same as that generally applied to persons civilly committed. *Id.* at 651 n. 50. This holding has been followed in *People v. McQuillan, supra,* and *State ex rel. Kovach v. Schubert, supra. Cf. State ex rel. Walker v. Jenkins, supra.*

■ The standard for involuntary civil commitment in New Jersey is set out in *N. J. S. A.* 30:4–44:

> If the patient shall be found not to be suffering from a mental illness, the court shall direct his discharge forthwith.

"Mental illness" is defined in *N. J. S. A.* 30:4–23:

> "Mental illness" shall mean disease to such an extent that a person so afflicted requires care and treatment for his own welfare, or the welfare of others, or of the community.

Prior to 1965, when the present statutes were enacted, New Jersey courts consistently held that a person could not be involuntarily committed unless, if permitted to remain at large, he would probably imperil his own safety or the safety or property of others. *In re Heukelekian,* 24 *N. J. Super.* 407, 409 (App. Div. 1953). *Accord, Aponte v. State,* 30 *N. J.* 441, 450 (1959); *DiGiovanni v. Pessel,* 104 *N. J. Super.* 550, 572 (App. Div. 1969), mod. on other grounds 55 *N. J.* 188 (1970); *In re J. W.,* 44 *N. J. Super.* 216, 226 (App. Div. 1957), certif. den. 24 *N. J.* 465 (1957); *In re R. R.,* 140 *N. J. Eq.* 371 (Ch. 1947). Although *N. J. S. A.* 30:4–44 has not been construed since the 1965 amendments, *N. J. S. A.* 30:4–82, which incorporates the same definitions, was construed in *State v. Caralluzzo,* 49 *N. J.* 152, 156 n. 1 (1967), to continue to mean "dangerous to self or to society" and we understand that to be the proper construction of the civil commitment statute, *N. J. S. A.* 30:4–44. Hence, if equal protection requires the standard for involuntary commitment of persons acquitted by reason of insanity to be identical to that applicable to civil commitment proceed-

ings generally, defendant may be committed only if he has been determined to be both mentally ill and dangerous to himself or to society.

■ Constitutional principles of equal protection, however, do not require that all persons be treated identically. They require only that any differences in treatment be justified by an appropriately strong state interest.

■ Under the so-called "two-tiered" analysis of the federal equal protection clause, the state need show only a rational basis for its classification, unless it involves "invidious" standards or infringes upon "fundamental" rights, in which case it must show a "compelling state interest." *San Antonio Independent School District v. Rodriguez,* 411 *U. S.* 1, 15, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973). The Supreme Court, in deciding *Jackson v. Indiana* and *Baxstrom v. Herold,* has not clearly indicated whether differences in commitment procedure between those applicable to persons acquitted by reason of insanity and those applicable to other persons subject to civil commitment must be justified by a "compelling state interest" or whether some lesser interest will suffice. State courts considering the question have divided. *Compare State v. Kee, supra,* 510 *S. W.* 2d at 481–82 (rational basis) *with People v. McQuillan, supra,* 221 *N. W.* 2d at 579 n. 4 (compelling state interest). It has even been suggested that *Jackson v. Indiana, supra* represents an abandonment of the "two-tiered" analysis. Nowak, "Realigning the Standards of Review Under the Equal Protection Guarantees — Prohibited, Neutral and Permissive Classifications," 62 *Geo. L. Rev.* 1071 (1974).

Fortunately, we need not leap into this bramble bush to decide the present case. The distinction between the standard for involuntary commitment for persons acquitted by reason of insanity and other persons lacks even a rational basis.

■ ■ The State argues that persons acquitted by reason of insanity pose a special hazard to the public because

they have been convicted of committing a criminal act and have proven by a preponderance of the evidence that the act resulted from mental illness, *State v. DiPaglia,* 64 *N. J.* 288 (1974), and that therefore they constitute an "exceptional class" of persons in whose confinement and treatment the State has a special interest. Accepting *arguendo* the factual assumption upon which this claim is predicated — that persons acquitted by reason of insanity pose a greater hazard to the public than other mentally ill persons[4] — the argument does not support a claim that the State should not be required to establish that the particular defendant poses a danger to himself or society. The State does not claim that it would be more burdensome to determine whether persons such as defendant are dangerous than it is generally for persons subject to civil commitment. Its contention that, as a class, persons acquitted by reason of insanity are more likely to be dangerous than other persons, does not rationally establish that any particular individual in the class should be confined even if he is not dangerous. Cases which treat persons acquitted by reason of insanity as an "exceptional class" as urged by the State, *e. g., Mills v. State, supra; Chase v. Kearns, supra; State v. Kee, supra,* have not done so in response to a contention that persons acquitted by reason of insanity must be shown to be dangerous to be involuntarily committed but rather in response to a contention that it must be shown that such persons are mentally ill, a matter not in dispute in this case. Such cases hold that persons acquitted by reason of insanity may be committed without a fresh determination of mental illness because they have proven insanity at the time of the crime by a preponderance of the evidence and insanity is presumed to continue.

---

[4]It should be noted that this factual assumption has not gone undisputed in the literature. *See* Wiehofen, "Institutional Treatment of Persons Acquitted by Reason of Insanity," 38 *Texas L. Rev.* 849, 855–56 (1960).

Such arguments, whose soundness is doubtful at best,[5] *see,* Note 74 *Colum. L. Rev.* 733, 746–50 (1974), are not pertinent to the contention that like other persons subject to involuntary commitment, persons acquitted by reasons of insanity may not be committed without a showing of dangerousness. *Johnson v. Robinson,* 509 *F.* 2d 395, 399 n. 18 (D. C. Cir. 1974) (dictum). The decisive consideration where personal liberty is involved is that each individual's fate must be adjudged on the facts of his own case, not on the general characteristics of a "class" to which he may be assigned.

## IV

Having determined that the commitment provisions of *N. J. S. A.* 2A:163–3 (and *N. J. S. A.* 2A:163–2) are unconstitutional in that they authorize involuntary commitment without proof of dangerousness,[6] the Court cannot simply stop short. Revision of the procedure for disposition of persons acquitted by reason of insanity is ultimately a matter for the Legislature. In the interim, the Court must itself formulate a constitutional and workable procedure. In doing so, we do not claim that the procedures

---

[5]It is perhaps significant that *State v. Kee,* 510 *S. W.* 2d 477 (Mo. Sup. Ct. 1974) and *Chase v. Kearns,* 278 *A.* 2d 132 (Me. Sup. Jud. Ct. 1971) both rely heavily on *State ex rel. Schopf v. Schubert,* 45 *Wis.* 2d 644, 173 *N. W.* 2d 673 (1970), a case since overruled by the Wisconsin Supreme Court. *State ex rel. Kovach v. Schubert,* 64 *Wis.* 2d 612, 219 *N. W.* 2d 341 (Sup. Ct. 1974), appeal dismissed 419 *U. S.* 1117, 95 S. Ct. 799, 42 *L. Ed.* 2d 817 (1975).

[6]This holding does not affect those portions of *N. J. S. A.* 2A:163–2 which govern disposition of persons found incompetent to stand trial but not insane at the time of the crime. We have previously held that such persons may be involuntarily committed to mental institutions only upon a finding of dangerousness to self or society. *State v. Caralluzzo,* 49 *N. J.* 152 (1967). *Cf. Jackson v. Indiana,* 406 *U. S.* 715, 92 S. Ct. 1845, 32 L. Ed. 2d 435 (1972) ; *Greenwood v. United States,* 350 *U. S.* 366, 76 S. Ct. 410, 100 L. Ed. 412 (1956).

which we adopt constitute either the only acceptable alternative or the best one. They are simply expedients to enable the machinery of justice to continue to function pending action by the Legislature.

 Following acquittal by reason of insanity, the defendant may, at the request of the State, be confined in a suitable mental institution for a period of 60 days for observation and examination. Proof by defendant that his criminal conduct was the result of mental illness provides sufficient justification for holding him in custody for a reasonable period of time to determine if he in fact should be indefintely committed. Such procedures for automatic temporary commitment, even though deviating from procedures applicable to civil commitment generally, have uniformly been upheld. *See, e. g., Bolton v. Harris,* 130 U. S. App. D. C. 1, 395 *F.* 2d 642, 651 (D. C. Cir. 1969); *State v. Clemons,* 110 *Ariz.* 79, 84, 515 *P.* 2d 324, 328 (Sup. Ct. 1973); *In re Franklin,* 7 *Cal.* 3d 126, 141–43, 101 Cal. Rptr. 553, 562–64, 496 *P.* 2d 465, 474–76 (Sup. Ct. 1972); *People v. McQuillan,* 392 *Mich.* 511, 524–30, 221 *N. W.* 2d 569, 575–77 (Sup. Ct. 1974). *See generally,* Hamann, "The Confinement and Release of Persons Acquitted by Reason of Insanity," 4 *Harv. J. Leg.* 55, 65–67 (1966); Annotation "Validity of statutory provisions for commitment to mental institution of one acquitted on grounds of insanity without formal determination of mental condition at time of acquittal," 50 *A. L. R.* 3d 144 (1973). While judicial decisions and scholarly commentators have differed on the most appropriate maximum to place on this period of temporary commitment, 60 days appears to be within the range of reasonableness.[7]

---

[7]*See, e. g., Bolton v. Harris, supra* at 651 (a reasonable period); *In re Franklin, supra,* 101 Cal. Rptr. at 563–64, 496 *P.* 2d at 475–76 (90 days); *People v. McQuillan, supra,* 221 *N. W.* 2d at 577 (60 days). A survey of hospital superintendents revealed recommendations ranging from several weeks to a year. Note, 56 *N. W. U. L. Rev.* 409, 466 (1961).

██ ██ Within this period, the State may move for indefinite commitment on the ground that defendant is mentally ill[8] and, if permitted to remain at large in the general population without some restraints, is likely to pose a danger to himself or to society. If, following a hearing, the court finds that the State has shown by a preponderance of the evidence[9] that defendant is mentally ill and is likely to pose such a danger, it should order suitable restraints placed upon defendant's liberty so as to protect the public and provide defendant with appropriate treatment. Such an order may take the form of confinement to an appropriate mental institution or other lesser restraints upon defendant's liberty — participation in a residential half-way house program, mandatory out-patient care, etc. The order should be molded so as to protect society's very strong interest in public safety but to do so in a fashion that reasonably minimizes infringements upon defendant's liberty and autonomy

---

[8]As the term is used in *N. J. S. A.* 30:4–23.

[9]While there is a trend in recent cases to require a burden of proof in civil commitment cases greater than simple preponderance of the evidence, *e. g., In re Ballay,* 157 *U. S. App. D. C.* 59, 482 *F.* 2d 648 (D. C. Cir. 1973); *Lessard v. Schmidt,* 349 *F. Supp.* 1078, 1094–95 (E. D. Wis. 1972) (three-judge court), vacated on other grounds and remanded 414 *U. S.* 473, 94 S. Ct. 713, 38 L. Ed. 2d 661 (1974), judgment modified on other grounds and reinstated 379 *F. Supp.* 1376, 1379 (1974), vacated on other grounds and remanded, 421 *U. S.* 957, 95 S. Ct. 1943, 44 *L. Ed.* 2d 445 (1975); *People v. Sansone,* 18 *Ill. App.* 3d 315, 324–26, 309 *N. E.* 2d 733, 740–741 (App. Ct. 1974), recent cases have also held that a standard of preponderance of the evidence is sufficient for commitment of persons acquitted by reason of insanity. *E. g., United States v. Brown,* 155 U. S. App. D. C. 402, 478 *F.* 2d 606 (D. C. Cir. 1973); *cf. In re Franklin, supra,* 101 *Cal. Rptr.* at 565–67, 496 P. 2d at 477–79 (shifting burden to defendant). *But cf. People v. Burnick,* 14 *Cal.* 3d 306, 121 Cal. Rptr. 488, 535 *P.* 2d 352 (Sup. Ct. 1975).

and gives him the best opportunity to receive appropriate care and treatment.[10]

In establishing a standard for commitment based on dangerousness as well as mental illness, we are cognizant of the difficulties which inhere in such a standard, a problem which we discussed in some depth in our recent decision in *State v. Carter,* 64 *N. J.* 382, 404–05 (1974). Dangerousness is a concept which involves substantial elements of vagueness and ambiguity, *see, e. g., Goldstein & Katz,* "Dangerousness and Mental Illness: Some Observation on the Decision to Release Persons Acquitted by Reason of Insanity," 70 *Yale L. J.* 224, 235–36 (1960), Rubin, "Prediction of Dangerousness in Mentally Ill Criminals," 27 *Arch. Gen. Psychiat.* 397, 398–99 (1972). The practical applica-

---

[10]We note that there is a body of recent case law suggesting that the due process clause requires that prior to ordering custodial care of persons subject to involuntary commitment, a court must consider less restrictive alternatives. *E. g., Welsch v. Likins,* 373 *F. Supp.* 487, 501–02 (D. Minn. 1974) ; *Lessard v. Schmidt,* 349 *F. Supp.* 1078, 1096 (E. D. Wis. 1972), vacated on other grounds and remanded, 414 U. S. 473, 94 S. Ct. 713, 38 L. Ed. 2d 661 (1974), judgment modified on other grounds and reinstated, 379 *F. Supp.* 1376, 1379 (1974), vacated on other grounds and remanded, 421 *U. S.* 957, 95 S. Ct. 1943, 44 L. Ed. 2d 445 (1975) ; *Dixon v. Attorney General,* 325 *F. Supp.* 966, 973–74 (M. D. Pa. 1971) ; *State v. Carter,* 64 *N. J.* 382, 421–23 (1974) (Clifford, J. concurring and dissenting). *Contra, State v. Sanchez,* 80 *N. M.* 438, 457 *P.* 2d 370 (Sup. Ct. 1968), appeal dismissed, 396 *U. S.* 276, 90 S. Ct. 588, 24 L. Ed. 2d 469 (1970). Similarly, recent decisions have held that persons may not be transferred to maximum security wards within mental institutions without consideration of less restrictive alternatives. *Covington v. Harris,* 136 U. S. App. D. C. 35, 419 *F.* 2d 617, 623 (D. C. Cir. 1969) ; *Davis v. Watkins,* 384 *F. Supp.* 1196 (N. D. Ohio 1974) ; *Kesselbrenner v. Anonymous,* 33 *N. Y.* 2d 161, 350 N. Y. S. 2d 889, 305 *N. E.* 2d 903 (Ct. App. 1973). See generally "Developments — Civil Commitment of the Mentally Ill," 87 *Harv. L. Rev.* 1190, 1245–52 (1974) ; Singer, "Sending Men to Prison: Institutional Aspects of the Burden of Proof and the Doctrine of the Least Restrictive Alternative as Applied to Sentencing Determinations," 58 *Cornell L. Rev.* 51 (1972). In view of our disposition of this case, we need not consider the soundness of this construction of the due process clause or its proper application to the present problem.

tion of a dangerousness standard is further impeded by the difficulty of making valid and meaningful predictions of the likelihood of future harmful conduct, *see, e. g.,* Diamond, "The Psychiatric Prediction of Dangerousness," 123 *U. Pa. L. Rev.* 439 (1974); "Developments — Civil Commitment of the Mentally Ill," 87 *Harv. L. Rev.* 1190, 1240–45 (1974); Rubin, *supra,* and by the subtle but strong pressures upon decision makers to overpredict dangerousness. *See, e. g.,* Diamond, *supra,* at 447; Rubin, *supra;* Dershowitz, "The Law of Dangerousness: Some Fictions about Predictions," 23 *J. Legal Ed.* 24 (1970). To a considerable extent, these are problems which can be dealt with only by trial judges on a case by case basis. An appellate court can only suggest guidelines for analysis.

The standard is "dangerous to self or society."[11] Dangerous conduct is not identical with criminal conduct. Dangerous conduct involves not merely violation of social norms enforced by criminal sanctions, but significant physical or psychological injury to persons or substantial destruction of property. Persons are not to be indefinitely incarcerated because they present a risk of future conduct which is merely socially undesirable. Personal liberty and autonomy are of too great value to be sacrificed to protect society against the possibility of future behavior which some may find odd, disagreeable, or offensive, or even against the possibility of future non-dangerous acts which would be ground for criminal prosecution if actually committed. Unlike inanimate objects, people cannot be suppressed simply because they may become public nuisances. *State v. Carter, supra* 64 *N. J.* at 405; *O'Connor v. Donaldson,* 422 *U. S.*

---

[11]While the focus of this opinion is on dangerousness to society, we recognize that the category of dangerousness to self is not free of difficulties. *See, e. g.,* Stanton, "Involuntary Civil Commitment Proceedings: A Trial Judge's View," 98 *N. J. L. J.* 425 (1975). Since that issue is not before us in the present case, we reserve those questions for another occasion.

563, 95 S. Ct. 2486, 45 L. Ed. 2d 396 (1975); *Cross v. Harris,* 135 U. S. App. D. C. 259, 418 *F.* 2d 1095, 1102 (D. C. Cir. 1969); *Davy v. Sullivan,* 354 *F. Supp.* 1320, 1330 (M. D. Ala. 1973) (three-judge court). *Cf. Millard v. Harris,* 132 U. S. App. D. C. 146, 406 *F.* 2d 964 (D. C. Cir. 1968).

▮▮ Commitment requires that there be a substantial risk of dangerous conduct within the reasonably foreseeable future. Evaluation of the magnitude of the risk involves consideration both of the likelihood of dangerous conduct and the seriousness of the harm which may ensue if such conduct takes place. *Cross v. Harris, supra,* 1100–1101; "Developments — Civil Commitment of the Mentally Ill," 87 *Harv. L. Rev.* 1190, 1236–40 (1974); Livermore, Malinquist & Mechl, "On the Justification for Civil Commitment," 115 *U. Pa. L. Rev.* 75, 81–83 (1968); *Goldstein & Katz, supra* at 235. It is not sufficient that the state establish a possibility that defendant might commit some dangerous acts at some time in the indefinite future. The risk of danger, a product of the likelihood of such conduct and the degree of harm which may ensue, must be substantial within the reasonably foreseeable future. On the other hand, certainty of prediction is not required and cannot reasonably be expected.

A defendant may be dangerous in only certain types of situations or in connection with relationships with certain individuals. An evaluation of dangerousness in such cases must take into account the likelihood that defendant will be exposed to such situations or come into contact with such individuals. *Cross v. Harris, supra* at 1101. *See State v. Johnson,* 8 *Or. App.* 263, 493 *P.* 2d 1386 (Ct. App. 1972) (defendant potentially dangerous to her children but was unlikely to have access to them); *see generally,* Diamond, *supra* at 449.

▮ Determination of dangerousness involves prediction of defendant's future conduct rather than mere characteri-

zation of his past conduct. Nonetheless, defendant's past conduct is important evidence as to his probable future conduct. *Cf. In re Miller,* 73 *Misc.* 2d 690, 702, 342 *N. Y. S.* 2d 315, 330 (N. Y. Cty. Ct. 1972). It is appropriate for the court to give substantial weight to the nature and seriousness of the crime committed by defendant and its relationship to his present mental condition.[12]

It should be emphasized that while courts in determining dangerousness should take full advantage of expert testimony presented by the State and by defendant, the decision is not one that can be left wholly to the technical expertise of the psychiatrists and psychologists. The determination of dangerousness involves a delicate balancing of society's interest in protection from harmful conduct against the individual's interest in personal liberty and autonomy. This decision, while requiring the court to make use of the assistance which medical testimony may provide, is ultimately a legal one, not a medical one. *Humphrey v. Cady,* 405 *U. S.* 504, 509, 92 S. Ct. 1048, 31 L. Ed. 2d 394 (1972) ; *Dixon v. Jacobs,* 138 U. S. App. D. C. 319, 427 *F.* 2d 589, 595 n. 17 (D. C. Cir. 1970).

Once the court has determined that defendant is mentally ill and is dangerous to himself or others, it must formulate an appropriate order. As we noted in *State v. Carter, supra,* this is an exceedingly difficult task, one calling for a high degree of judicial flexibility and imagination. The object of the order is to impose that degree of restraint upon defendant necessary to reduce the risk of danger which he poses to an acceptable level. Doubts must be resolved in favor of protecting the public, but the court should not, by

---

[12]Empirical studies suggest that prior criminal conduct is an important factor — perhaps the most important — in the prediction of future dangerous conduct. Kozol, Boucher & Garofalo, "The Diagnosis and Treatment of Dangerousness," 18 *Crime & Delinq.,* 371, 384 (1972) ; Rubin, *supra* at 400; *see generally,* "Developments — Civil Commitment of the Mentally Ill," 87 *Harv. L. Rev.* 1190, 1244 (1974).

its order, infringe upon defendant's liberty or autonomy any more than appears reasonably necessary to accomplish this goal. Nonetheless, where the public cannot be adequately protected by any practical lesser restraint, the court is justified in ordering defendant institutionalized in an appropriate public psychiatric hospital. Court imposed restraints must, of course, always be coupled with a corresponding opportunity for care and treatment. *State v. Carter, supra* 64 *N. J.* at 393–94; *In re D. D.,* 118 *N. J. Super.* 1, 6 (App. Div. 1966). *Cf. O'Connor v. Donaldson,* 422 U. S. 563, 95 S. Ct. 2486, 45 L. Ed. 2d 396 (1975); *Wyatt v. Stickney,* 325 *F. Supp.* 781 (M. D. Ala. 1971), aff'd *sub nom. Wyatt v. Aderholt,* 503 *F.* 2d 1305 (5 Cir. 1974).

In evaluating the possibility of imposing restraints less severe than complete institutionalization the considerations discussed in *State v. Carter, supra,* 64 *N. J.* at 403–04 in connection with conditional release are pertinent and should be taken into account:

> The court's inquiry as to conditional release must be as broad as possible. Good patients may be bad risks. The disposition must be individualized with the focus on the offender, not the offense he committed, although such offense can serve as an indication of the harm the patient is capable of inflicting. Perhaps most important is the establishment of psychiatric out-patient care. The conditions under which the patient will live after release should certainly be conducive to his recovery, or at the very least, not aggravate his condition. His family life and friends, the area in which he lives and work that he could obtain, if it would be helpful, are all relevant. See generally, Weihofen, *supra.*
>
> The success of conditional release depends, to a large extent, upon the adequacy of the supervisory controls imposed by the courts to insure the public safety. The most obvious condition for safeguarding the community against a repetition of criminal behavior is a careful follow-up and required attendance for psychiatric treatment over a long period of time. Of course, the frequency of visits to the treating psychiatrist would depend upon the individualized circumstances of each case. But, in any event, the psychiatrist must continuously evaluate the patient's adjustment and be able to anticipate, and thus prevent psychotic episodes. Plainly, the patient must be a fit subject for out-patient treatment. Psychiatric treatment under the compulsion of a court order without the willing cooperation of the patient would obviously be counter-productive.

██ ██ Orders, either requiring institutionalization or imposing lesser restraints are subject to modification on grounds that defendant has become more or less dangerous than he was previously, or termination, on the grounds that he is no longer mentally ill and dangerous, on the motion of either the State or the defendant.[13] Where the court has probable cause to believe that a non-institutionalized defendant poses an imminent danger to himself or others, whether because the original restraints have proven inadequate, because defendant has not complied with the terms of the order, or because defendant's condition has changed, it may order defendant temporarily institutionalized for further observation and evaluation pending proceedings for modification of the prior order. Where defendant is temporarily institutionalized under such circumstances, a hearing on modification of the order should be conducted as promptly as is practical. Once, however, the commitment

---

[13]The burden of proof by preponderance of the evidence is to be borne by the party seeking the modification or termination.

We recognize that this represents a deviation from our holding in *State v. Carter*, 64 *N. J.* 382, 408–09 (1974), that conditional release was to be granted only upon proof by clear and convincing evidence by the patient that he was a fit candidate for such treatment. Under the law prevailing at the time *State v. Carter* was decided, a person involuntarily committed following acquittal by reason of insanity could finally released upon proof by him by a preponderance of the evidence that he had been "restored to reason," a stringent standard that could not be met by a simple showing of lack of dangerousness. *State v. Carter* introduced an entirely different standard for conditional release, one in which lack of dangerousness was a critical factor; and we found no inconsistency in requiring proof of lack of dangerousness by clear and convincing evidence for conditional release while requiring proof of "restoration to reason" by only a preponderance of the evidence for final release. A consequence of today's decision is that lack of dangerousness is now also a ground for final release. To retain the burden of proof by clear and convincing evidence would create a logically anomalous situation in which a patient might be able to meet the burden of proof to establish himself fit for final release, but be unable to meet the burden of proof to modify the commitment order so as to reduce the restraints imposed upon him, *i. e.*, to obtain a conditional release.

order is unconditionally terminated, the defendant must be treated thereafter like any other person for purposes of involuntary commitment. He may be committed only by institution of appropriate civil commitment proceedings under *N. J. S. A.* 30:4–23 *et seq.*

We have chosen to separate determination as to whether defendant may be involuntarily committed from determination by the jury of guilt or innocence and placed the former question wholly in the hands of the trial judge, for decision after the trial, for two reasons.[14] First, proofs pertinent to the likelihood of harmful conduct by defendant in the future are altogether different in substance and character from those pertinent to guilt or innocence or to defendant's insanity plea. Introduction of such proofs at trial creates a significant risk that the jury may be confused or may be distracted from proper consideration of guilt or innocence, the principal question before it. Second, requiring defendant to simultaneously argue to the jury both that he was insane at the time of the crime and that he is no longer mentally ill or dangerous places him in a difficult and unfair tactical position. He may reasonably fear that the jury will be very loath to reach a verdict of not guilty by reason of insanity if he successfully demonstrates that he is no longer dangerous and must be released upon such a verdict. This fear may well deter him from vigorously arguing present sanity and lack of dangerousness under such circumstances. *In re Franklin, supra* 101 Cal. Rptr. at 558, 496 P. 2d at 470; *cf.* Wiehofen, "Institutional Treatment of Persons Acquitted by Reason of Insanity," 38 *Texas L. Rev.* 849, 850 (1960). Separating the issues frees defendant from this

---

[14]Civil commitment under *N. J. S. A.* 30:4–23 *et seq.* are nonjury proceedings. The empaneling of a jury for proceedings under *N. J. S. A.* 2A:163–2 is wholly discretionary with the judge. *N. J. Const.* (1947) Art. I, ¶ 9 expressly excludes such proceedings from the right to jury trial. *State v. Gibson,* 15 *N. J.* 384, 390–91 (1954).

potential unfairness. We re-emphasize that this is merely an interim procedure adopted by the Court and is not to be understood as constitutionally compelled. *See State ex rel. Kovach v. Schubert,* 64 *Wis.* 2d 612, 219 *N. W.* 2d 341 (Sup. Ct. 1974), appeal dismissed 419 *U. S.* 1117, 95 S. Ct. 799, 42 *L. Ed.* 2d 817 (1975).

▆ At the initial trial the jury should no longer be instructed to render a special verdict as to whether defendant's insanity continues. The trial judge should, however, instruct the jury as to the consequences of a verdict of not guilty by reason of insanity so that the jury does not act under the mistaken impression that defendant will necessarily be freed or be indefinitely committed to a mental institution. *See Bolton v. Harris, supra* at 651 n. 50. *See generally Lyles v. United States,* 103 U. S. App. D. C. 22, 254 *F.* 2d 725, 728–29 (D. C. Cir. 1957), *cert.* denied 356 *U. S.* 961, 78 S. Ct. 997, 2 L. Ed. 2d 1067 (1958), 362 *U. S.* 943, 80 S. Ct. 809, 4 L. Ed. 2d 771 (1960), 368 *U. S.* 992, 82 S. Ct. 610, 7 L. Ed. 2d 529 (1962) ; *Commonwealth v. Mutina, Mass.,* 323 *N. E.* 2d 294 (1975).

V

▆ In the interests of clarity, it is appropriate for us to attempt to delineate the relationship between our decision today and our prior decisions in *State v. Maik,* 60 *N. J.* 203 (1971), and *State v. Carter,* 64 *N. J.* 382 (1974). In *State v. Maik, supra,* the Court, speaking through Chief Justice Weintraub, definitively construed the commitment provisions of *N. J. S. A.* 2A:163–2 and 2A:163–3. *Id.* 60 *N. J.* at 216–21. The constitutionality of these provisions was not challenged by the parties in that case and was not considered by the Court in its decision. We now conclude that the standards for commitment established in *N. J. S. A.* 2A:163–2 and *N. J. S. A.* 2A:163–3, as construed by the Court in *State v. Maik, supra,* are unconstitutional, and, to that extent, the decision in *State v. Maik* is overruled.

In *State v. Carter, supra,* the Court further elaborated the principles enunciated in *State v. Maik, supra,* and extended them to permit conditional release of persons committed under *N. J. S. A.* 2A:163–2 or *N. J. S. A.* 2A:163–3. The majority had no occasion in its opinion to consider · possible challenges to the provisions of *N. J. S. A.* 2A:163–2 and *N. J. S. A.* 2A:163–3 on constitutional grounds. Since the decision in *State v. Carter* is predicated upon, and is an elaboration of, the construction of these commitment provisions set out in *State v. Maik,* the specific holdings in that case are superseded, but only to the extent inconsistent with this opinion, and particularly by our conclusion today that these provisions are unconstitutional.

## VI

Defendant in the present case did not receive the type of hearing outlined above at the time of his commitment. No inquiry was made at that time into whether he was in fact dangerous to himself or others. He has since been granted a conditional release under *State v. Carter,* 64 *N. J.* 382 (1974). He is, nonetheless, entitled to a hearing within 60 days as to whether he is mentally ill and, whether, if permitted to remain at large in the general population without some restraints, he is likely to pose a danger to himself or to society.

## VII

The final question to be decided is whether today's holding should be applied retroactively to other persons who are presently confined to State mental institutions following acquittal by reason of insanity. The decision to give such a holding retroactive or prospective effect is one that must depend upon a balancing of the interests of the State and the individuals affected. *State v. Nash,* 64 *N. J.* 464, 471 (1974) ;

*State v. Johnson*, 43 *N. J.* 572 (1965), aff'd 384 *U. S.* 719, 86 S. Ct. 1772, 16 L. Ed. 2d 882 (1966); *Linkletter v. Walker*, 381 *U. S.* 618, 85 S. Ct. 1731, 14 L. Ed. 2d 601 (1965); *cf. Darrow v. Hanover Tp.*, 58 *N. J.* 410 (1971).

Persons who have been involuntarily committed to mental institutions under an improper standard suffer continuing injury, which may extend indefinitely into the future. The effect of today's decision is not to cast doubt merely upon the adequacy of procedural safeguards surrounding the decision to commit, *see State v. Johnson, supra,* but upon the correctness of the very decision itself. Fairness demands that further confinement of a person presently committed be conditioned upon a showing by the State that he can in fact be committed under constitutionally proper standards. Since the number of persons involved is comparatively small,[15] applying this holding retroactively poses little danger that the administration of justice will be impaired or excessively burdened. *See generally State v. Nash, supra.*

We therefore conclude that today's holding should be applied retroactively to persons presently committed to State mental institutions (or conditionally released from such institutions pursuant to *State v. Carter, supra*) following acquittal by reason of insanity, and that, like the defendant, they are entitled to commitment hearings within 60 days. *Cf. Smith v. Robey,* 57 *Mich. App.* 630, 226 *N. W.* 2d 593 (Ct. App. 1975).

Reversed and remanded.

CLIFFORD, J. (dissenting in part). This case represents another chapter in my continuing dialogue with my colleagues over the fundamental "burden of proof" issue in

---

[15]The Attorney General has informed the Court that as of June 27, 1975, only 39 persons were confined to State mental institutions following acquittal by reason of insanity.

involuntary civil commitments. I am constrained to voice my grave concern here, as in *State v. Carter*, 64 *N. J.* 382, 410 (1974) (concurring and dissenting opinion), that in moving a step forward by recognizing rights of mental patients we not take two steps backward by neglecting the evidentiary rules necessary to safeguard those rights. The Court today runs the risk of doing precisely that by applying an inappropriate burden of proof and by overruling *sub silentio* those New Jersey cases which have called for a reasonable doubt standard in involuntary commitments.

While I concur in the Court's resolution of the essential constitutional issues with which it has now come to grips, I disagree with the emphasized part of the following from the majority opinion:

> If, following a hearing, the court finds that the State has shown by a *preponderance of the evidence* that defendant is mentally ill and is likely to pose * * * a danger [to himself or to society], it should order suitable restraints placed upon defendant's liberty so as to protect the public and provide defendant with appropriate treatment (emphasis added; footnote omitted). [*ante* at 257.]

This "preponderance of the evidence" language must be read into our revised *R.* 4:74–7 governing civil commitment, which was under consideration at the same time as our deliberations on the instant case. It has now been adopted to take effect September 8, 1975. The Rule reads in pertinent part as follows:

> (f) Final Judgment of Commitment, Review. If the court finds from the evidence presented at the [commitment] hearing that the institutionalization of the patient is required by reason of his being a danger to himself or the community if he is not so confined and treated, it shall enter a judgment of commitment to an appropriate institution. * * *

The Rule being silent on burden of proof,[1] establishment of

---

[1]The decision to leave the Rule silent on burden of proof runs counter to the specific recommendation of the Supreme Court Committee on Civil Practice, whose report appears at 98 *N. J. L. J.* 377

the appropriate burden is left to case law. One effect of today's decision is to apply the bare preponderance burden not only to cases such as the one *sub judice,* where defendant was relieved of criminal responsibility for a violent act by reason of his insanity, but also to all other involuntary commitments. I would require proof of dangerousness beyond a reasonable doubt (which as I hope to demonstrate later in this opinion has always been the burden of proof requirement for involuntary civil commitment), preferably in terms referred to in footnote 1, *supra.* But I am reluctant to use this case in its present posture as the vehicle for deciding that critical issue.

(1975). The Committee's suggested language was "If the court finds *beyond a reasonable doubt* from the evidence presented at the hearing that the institutionalization of the patient is required by reason of the *probability* of the patient being a danger to himself or the community * * *" (emphasis added). While I recognize of course that we are not bound by our committees' recommendations, nevertheless it is not without significance that this Committee's thoughtful report indicated complete unanimity of its distinguished members on this point. Rather than the language of the Rule as finally adopted, which leaves out all reference to burden of proof, I would have preferred a version suggested by Professor Robert A. Carter of Rutgers Law School, a member of the Committee. Professor Carter wrote to the Clerk of the Supreme Court upon receipt of a suggested revision of the Rule, made by the Court after receipt of the Committee's report. That revised draft left out the "probability" element and called for a finding simply of "dangerousness" beyond a reasonable doubt (the other end of the spectrum from where today's decision leaves the matter). Professor Carter pointed out that the Committee sought to recognize between facts and the reasonable inferences to be drawn therefrom a distinction which might be brought more sharply into focus by this suggested alternative:

> If the court finds, beyond a reasonable doubt, from evidence presented at the hearing, facts from which it can be inferred that the institutionalization of the patient is required by reason of his being a danger to himself or the community * * *.

I think the distinction between a finding of dangerousness beyond a reasonable doubt and a finding beyond a reasonable doubt of facts from which the likelihood of dangerousness may reasonably be inferred is a real one and that a standard of proof based on the latter is, as urged by Professor Carter, a most workable standard.

While I appreciate the necessity of formulating a constitutional and workable procedure for disposition of persons acquitted by reason of insanity in light of our declaration of the unconstitutionality of *N. J. S. A.* 2A:163–3, I would have preferred to be favored with the views of the parties on at least the "burden of proof of dangerousness" phase of that procedure. That issue was never briefed or argued — understandably, because all defendant sought by way of relief in this Court was a remand for the purpose of determining if his "condition had improved to the extent that he should be conditionally released." The parties never reached nor apparently even contemplated the burden of proof issue. No reason has been offered why we should not follow our frequent practice of calling for at least briefs and perhaps additional oral argument on the question. To exercise that minimal caution seems the better practice when we either undertake to change the established law or start treading on unfamiliar soil, both of which we are doing here. The practical consequences of our own recent administrative directives, revised Rules, and holdings in the area of mental health law are but dimly perceived. As might be expected, the people most intimately involved as participants in the legal process have at this early stage some sharply divergent perceptions of that process itself and of their roles therein. Compare Stanton, "Involuntary Civil Commitment Proceedings: A Trial Judge's View," 98 *N. J. L. J.* 425 (1975), with Singer, "Civil Commitment Proceedings: A Response to 'A Trial Judge's View,'" 98 *N. J. L. J.* 553 (1975). We should invite the parties to share with us their views. However, under the circumstances I must announce my position without the benefit of counsel's research and efforts at persuasion.

I start with the notion, now firmly established, that for all the reasons which Justice Pashman has so aptly set forth in the majority opinion, and to which he adverted in his opinion for the Court in *State v. Carter, supra*, 64 *N. J.* at

401, our law treats one in the position of this defendant precisely the same way as any other patient facing involuntary commitment to a mental institution. No one, I daresay, would deny due process to people in that circumstance. What "process" is "due" in a particular factual context turns in large part upon what interests are involved. At stake in any involuntary commitment are the security of the community on the one hand and, on the other, the patient's liberty, "an interest of transcending value." *Speiser v. Randall,* 357 U. S. 513, 525, 78 S. Ct. 1332, 1341, 2 L. Ed. 2d 1460, 1472 (1958). When personal liberty may be lost and the defendant faces the possible stigma of a criminal conviction,[2] the Supreme Court has declared as a constitutional imperative that proof of all elements of the case against him be beyond a reasonable doubt. *In re Winship,* 397 U. S. 358, 363–64, 90 S. Ct. 1068, 1072–73, 25 L. Ed. 2d 368, 375 (1970).

Mr. Justice Harlan's concurring opinion in *Winship* exposes by meticulous analysis the basic policy considerations which lead to selection of what standard of proof should be applied in a given situation.[3] He emphasizes that our

---

[2] While Chief Justice Burger wrote, in 1964 when then a Judge of the District of Columbia Circuit, that to him "the arguments on the stigma of a guilty verdict are largely emotional nonsense," "Psychiatrists, Lawyers, and the Courts," 28 *Fed. Prob.* 3, 9 (1964), members of that same court later pointed to the depressing evidence that the stigma associated with involuntary civil commitment is at least as severe as the stigma born of a criminal conviction, and observed that only an "enlightened minority" has been persuaded to accept mental illness as a disease similar to any physical ailment of the body. *In re Ballay,* 157 U. S. App. D. C. 59, 482 F. 2d 648, 668 (D. C. Cir. 1973).

[3] The discussion is so illuminating that I run the risk of unduly burdening the reader by setting forth part of it at some length:

[E]ven though the labels used for alternative standards of proof are vague and not a very sure guide to decisionmaking, the choice of the standard for a particular variety of adjudication does, I think, reflect a very fundamental assessment of the comparative social costs of erroneous factual determinations.

system of laws does "not view the social disutility of convicting an innocent man as equivalent to the disutility of acquitting someone who is guilty," and that when personal liberty is in jeopardy, the margin of error in fact-finding should be reduced by increasing the burden of proof. *In re Winship, supra,* 397 *U. S.* at 372, 90 S. Ct. at 1076, 25 *L. Ed.* 2d at 380. See *In re Ballay,* 157 U. S. App. D. C. 59, 482 *F.* 2d 648, 662–67 (D. C. Cir. 1973).

To explain why I think this so, I begin by stating two propositions, neither of which I believe can be fairly disputed. First, in a judicial proceeding in which there is a dispute about the facts of some earlier event, the factfinder cannot acquire unassailably accurate knowledge of what happened. Instead, all the factfinder can acquire is a belief of what *probably* happened. The intensity of this belief — the degree to which a factfinder is convinced that a given act actually occurred — can, of course, vary. In this regard, a standard of proof represents an attempt to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication. Although the phrases "preponderance of the evidence" and "proof beyond a reasonable doubt" are quantitatively imprecise, they do communicate to the finder of fact different notions concerning the degree of confidence he is expected to have in the correctness of his factual conclusions.

A second proposition, which is really nothing more than a corollary of the first, is that the trier of fact will sometimes, despite his best efforts, be wrong in his factual conclusions. In a lawsuit between two parties, a factual error can make a difference in one of two ways. First, it can result in a judgment in favor of the plaintiff when the true facts warrant a judgment for the defendant. The analogue in a criminal case would be the conviction of an innocent man. On the other hand, an erroneous factual determination can result in a judgment for the defendant when the true facts justify a judgment in plaintiff's favor. The criminal analogue would be the acquittal of a guilty man.

The standard of proof influences the relative frequency of these two types of erroneous outcomes. If, for example, the standard of proof for a criminal trial were a preponderance of the evidence rather than proof beyond a reasonable doubt, there would be a smaller risk of factual errors that result in freeing guilty persons, but a far greater risk of factual errors that result in convicting the innocent. Because the standard of proof affects the comparative frequency of these two types of erroneous outcomes, the choice of the standard to be applied in a particular kind of litigation

Can we carry this analysis over to the involuntary commitment context? I believe we can. The fact that the proceeding for commitment is "civil" in nature rather than "criminal" presents no obstacle. *In re Gault*, 387 *U. S.* 1, 87 S. Ct. 1428, 18 *L. Ed.* 2d 527 (1967), and *In re Winship, supra,* both involving juvenile proceedings civil in nature, have put to rest any suggestion that the measure of due process which must be afforded a defendant is to be determined by the label under which the proceeding parades.

should, in a rational world, reflect an assessment of the comparative social disutility of each.

When one makes such an assessment, the reason for different standards of proof in civil as opposed to criminal litigation becomes apparent. In a civil suit between two private parties for money damages, for example, we view it as no more serious in general for there to be an erroneous verdict in the defendant's favor than for there to be an erroneous verdict in the plaintiff's favor. A preponderance of the evidence standard therefore seems peculiarly appropriate for, as explained most sensibly, it simply requires the trier of fact "to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence."

In a criminal case, on the other hand, we do not view the social disutility of convicting an innocent man as equivalent to the disutility of acquitting someone who is guilty. As Mr. Justice Brennan wrote for the Court in Speiser v. Randall, 357 U. S. 513, 525–526, 78 S. Ct. 1332, 1341–1342, 2 L. Ed. 2d 1460, 1472 (1958) :

"There is always in litigation a margin of error, representing error in fact finding, which both parties must take into account. Where one party has at stake an interest of transcending value — as a criminal defendant his liberty — this margin of error is reduced as to him by the process of placing on the other party the burden *** of persuading the fact-finder at the conclusion of the trial of his guilt beyond a reasonable doubt."

In this context, I view the requirement of proof beyond a reasonable doubt in a criminal case as bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free. It is only because of the nearly complete and long-standing acceptance of the reasonable-doubt standard by the States in criminal trials that the Court has not before today had to hold explicitly that due process, as an expression of fundamental procedural fairness, requires a more stringent standard for criminal trials than for ordinary civil litigation (emphasis in the original; footnotes omitted). [397 *U. S.* at 369–72, 90 S. Ct. at 1075–1077, 25 *L. Ed.* 2d at 378–81.]

See *Murel v. Baltimore City Crim. Ct.*, 407 *U. S.* 355, 364, 92 S. Ct. 2091, 2095, 32 *L. Ed.* 2d 791, 796–97 (1972) (Douglas, J., dissenting). *Gault* stresses the restraint of liberty to which the party is exposed. Mr. Justice Fortas said:

A boy is charged with misconduct. The boy is committed to an' institution where he may be restrained of liberty for years. It is of no constitutional consequence — and of limited practical meaning — that the institution to which he is committed is called an Industrial School. The fact of the matter is that, however euphemistic the title, a "receiving home" or an "industrial school" for juveniles is an institution of confinement in which the child is incarcerated for a greater or lesser time. His world becomes "a building with white-washed walls, regimented routine and institutional hours * * *." Instead of mother and father and sisters and brothers and friends and classmates, his world is peopled by guards, custodians, state employees, and "delinquents" confined with him for anything from waywardness to rape and homicide (footnotes omitted). [387 *U. S.* at 27, 87 S. Ct. at 1443, 18 *L. Ed.* 2d at 546.]

Not much different, I submit, from what may be found in some parts of our mental institutions. And the period for which a mental patient's liberty may be restrained is not fixed in any sense but rather is termed "permanent," *R.* 4: 74–7(e), subject to periodic review, *R.* 4:74–7(f), or, as more accurately (if no less disquietingly) labelled by the majority, "indefinite," *ante* at 257.

Much more important to me is that element on which Judge Tamm focuses in *In re Ballay, supra,* 482 *F.* 2d at 664–67, "the very nature of the evidence presented." He discusses the difficulties implicit in proving "dangerousness," emphasized in both of the opinions in *Carter* and the majority opinion herein. The point as I see it is that the impulse of the psychiatrist is to err on the side of finding "dangerousness" more often than not, see *State v. Carter, supra,* 64 *N. J.* at 426–27 n. 7 (concurring and dissenting opinion); that the psychiatric community is in frequent disagreement on diagnostic conclusions, see Diamond, "The Psychiatric Prediction of Dangerousness," 123 *U. Pa. L.*

*Rev.* 439 (1974) ; Ennis and Litwack, "Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom," 62 *Calif. L. Rev.* 693 (1974) ; Rosenhan, "On Being Sane in Insane Places," 13 *Santa Clara Law.* 379 (1973) ; and that in making a determination of dangerousness (largely undefined and even less susceptible of proof than mental illness) the finder of fact "may unduly reflect clinical definitions and conclusions rather than the appropriate judicial exegetics and community values." *In re Ballay, supra,* 482 *F.* 2d at 665. The difficulty in making the critical determination, that defendant is mentally ill and poses a danger to himself or society if not restrained, militates in favor of the higher burden of proof beyond a reasonable doubt to reduce the substantial opportunity for error, particularly when, as here, the consequence of that error is loss of liberty. See, in addition to the cases recognized by the majority in footnote 9, *ante* at 257, as representative of the recent trend to require a burden of proof greater than bare preponderance of the evidence, *Davis v. Watkins,* 384 *F. Supp.* 1196 (N. D. Ohio 1974) ; *Lynch v. Baxley,* 386 *F. Supp.* 378 (M. D. Ala. 1974) ; *Denton v. Commonwealth,* 383 *S. W.* 2d 681 (Ky. App. 1964). See also *People v. Burnick,* 14 *Cal.* 3d 306, 121 *Cal. Rptr.* 488, 535 P. 2d 352 (1975) (requiring proof of dangerousness beyond a reasonable doubt for commitment under a "civil" mentally disordered sex offender statute).

In line with these decisions are several New Jersey cases holding that reasonable doubt is the appropriate standard for confinement: *In re Heukelekian,* 24 *N. J. Super.* 407 (App. Div. 1953) ; *In re J. W.,* 44 *N. J. Super.* 216 (App. Div.), certif. den., 24 *N. J.* 465 (1957) ; *In re Perry,* 137 *N. J. Eq.* 161 (Ch. 1945).

The appellant in *In re Heukelekian, supra,* sought reversal of a declaration of insanity resulting in her commitment to the State Hospital at Marlboro. The trial judge had found that "the evidence by a preponderance of the

proof established the insanity of the subject." 24 *N. J. Super.* at 409. The Appellate Division reversed and remanded, pointing out that to support continued confinement, there had to be a showing that "if the person is liberated she will probably imperil her own safety or the safety or property of others," with "a reasonable doubt of a person's insanity [to] be resolved in her favor." *Id.*

*In re J. W., supra,* held that the medical certificate on the basis of which plaintiff was involuntarily confined in a mental hospital was inadequate to prove the requisite mental conditions justifying detention. Judge Conford, citing *Perry, supra,* wrote "we are bound to seek the clearest legislative authorization before we can accord judicial sanction to the deprivation of personal liberty in a given factual situation," 44 *N. J. Super.* at 225–26; and, significantly, "[w]here the right of liberty is involved a reasonable doubt as to the applicability of the statute to the facts presented should be resolved in favor of the subject." *Id.* at 226.

In *In re Perry, supra,* a writ of *habeas corpus* activated proceedings to secure the release of one confined to the New Jersey State Hospital at Trenton. Vice-Chancellor Jayne was called upon to determine whether the man was sane or insane. Specifically in issue was whether, if liberated, Perry was "likely to appreciably menace the safety of himself or that of the person or property of others." 137 *N. J. Eq.* at 164. The court decided he was not, observing that "[c]ertainly with the right of liberty involved, a reasonable doubt of [Perry's] insanity should be resolved in his favor." *Id.*

If these precedents are to be cast aside, as they have been today, they deserve more than a statement of some new standard mentioned almost in passing and conspicuously unencumbered by analysis or exposition of the reasons for its adoption.

One final thought. The trial judge is to make the critical determination of dangerousness. Some may contend that in so doing the judge will likely not differentiate between

bare preponderance and reasonable doubt, but will merely announce whatever standard happens to comport with his visceral reaction; and that under these circumstances this dissent which emphasizes the distinction between the two burdens of proof is simply theoretical and so much academic claptrap. I think that type of response by a trial judge most unlikely. First, that notion does not square with my confidence in the intellectual honesty of our bench (I look forward to a record in one of these cases wherein the hearing judge reflects on how he makes his decision and lets us know whether he is being given sufficient guidance). Second, the experience in at least one landmark case demonstrated that a trial judge, sitting without a jury, was perfectly capable of differentiating between the requirements of the respective standards. In *In re Winship, supra,* it is pointed out that "the trial judge's ability to distinguish between the [reasonable doubt and preponderance] standards enabled him to make a finding of guilt that he conceded he might not have made under the standard of proof beyond a reasonable doubt." 397 *U. S.* at 367, 90 S. Ct. at 1074, 25 *L. Ed.* 2d at 377.

For the reasons presented I dissent from so much of the Court's opinion as would permit involuntary committees to be "taken from their families and deprived of their constitutionally protected liberty under the same standard of proof applicable to run-of-the-mill automobile negligence actions." *Murel v. Baltimore City Crim. Ct., supra,* 407 *U. S.* at 359, 92 S. Ct. at 2093, 32 *L. Ed.* 2d at 794 (Douglas, J., dissenting) (footnote omitted).

*For reversal and remandment*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN and PASHMAN and Judge CONFORD—5.

*Dissenting in part*—Justice CLIFFORD—1.