832 A.2d 364

IN RE COMMITMENT OF G.K.

Superior Court of New Jersey
Law Division Camden County

Decided April 16, 2003.

*Grace MacAulay*, Assistant Prosecutor, for the State.

*Stanley Shur*, Deputy Assistant Public Defender, for Defendant.

McNEILL, III, J.S.C.

G.K. was arrested on July 29, 1992 after she started a fire in her apartment located at 11 North 30th Street, Apartment A, in Camden, New Jersey. The fire spread and destroyed both G.K.'s apartment and the adjoining apartment of Frank Castner, Lisa Castner, and Michael Jackson. G.K. was charged with aggravated arson, arson, and failure to report or control a dangerous fire. G.K. was sent immediately to John F. Kennedy Hospital in Cherry

Hill, New Jersey, and then two weeks later to the Camden County Health Services Center in Lakeland, New Jersey. G.K. was diagnosed to be suffering from schizophrenia and chronic paranoia. G.K.'s psychiatric records note that there was not even a trace of mental disturbance in her life prior to the age of forty. She reports that the precipitating events to the onset of her mental illness were a broken engagement with an alcoholic man and a mugging in the city of Camden in which she sustained injuries to her head and face.

G.K. remained at the center until January 15, 1993, when she was discharged in stable condition. However, the actual *Krol* adjudication was not made until November 9, 1994. At that time, G.K. was ordered to continue psychiatric care for ten years, continue her medications, and appear for periodic review hearings. Defense counsel did voice an objection to the ten-year time period. The initial follow up hearing was scheduled for June 9, 1995, and various status hearings were held throughout the past nine years. With the exception of those status hearings, G.K. has not had any contact with the criminal justice system since her arrest, nor has she had any cause to be re-institutionalized since her release in 1993. At the writing of this opinion, G.K.'s psychiatrist notes reflect that she is not showing any evidence of unusual behavior and denies any feelings of suicide or homicide. G.K. appears to her treating psychiatrist to be sociable, friendly, and cooperative.

Since the court's finding of G.K. Not Guilty by Reason of Insanity (NGI) on November 9, 1994, her case has been before the court several times, each time resulting in a continuation of *Krol* status. It should be noted that there was never a statement or finding during these hearings that G.K. was not complying with her conditions or that she had suffered a setback in her treatment. Furthermore, at a hearing on March 26, 1999, it was agreed upon by both the State and defense counsel that G.K. was progressing quite well. Regardless, the Court continued G.K.'s *Krol* status, finding that to do so would not be a great burden upon her or subject her to any limitations of freedom.

Prior to the most recent hearing regarding G.K., her counsel requested that this court determine what would be the proper max out date for G.K.'s *Krol* status. G.K. and her attorney contended that, in fact, the max out date for her *Krol* status had already passed.

The standard for commitment was set forth in *State v. Krol*, 68 N.J. 236, 344 A.2d 289, (1975). In *Krol*, the Court held that "the rationale for involuntarily committing such persons...is, rather, to protect society against individuals who, through no culpable fault of their own, pose a threat to public safety." *State v. Krol*, 68 *N.J.* 236, 246, 344 *A.*2d 289, 295. Further, "The standard for commitment is simply that defendant's 'insanity continues'". *Krol*, 68 *N.J.* at 247, 344 *A.*2d at 295. However, the State must do more than "establish a possibility that defendant might commit some dangerous acts at some time in the indefinite future." *Krol* at 260, 344 *A.*2d at 302. Further, when the court does order a commitment, it "should be molded so as to protect society's very strong interest in public safety but to do so in a fashion that reasonably minimizes infringements upon defendant's liberty..." *Id* at 257, 344 *A.*2d at 300.

G.K. and the State have quite a difference of opinion on how the courts should determine the proper max out date for persons on *Krol* status.

Both the State and G.K. rely on the New Jersey Supreme Court's ruling in *In re Commitment of W.K.*, 159 N.J. 1, 731 A.2d 482, (1999), to determine the proper max out date for a *Krol* commitment. In *W.K.*, the Court addressed the issue of the proper "maximum term for which a person found not guilty by reason of insanity (NGI) may remain confined under *Krol* status." *W.K.*, 159 *N.J.* 1, 2, 731 *A.*2d at 482. Clearly, G.K.'s interpretation of *W.K.* varies greatly from that of the State regarding the Court's intentions.

The general principle that one can walk away with after examining *W.K.*, is the following: "an NGI defendant may remain under *Krol* commitment for the maximum ordinary aggregate terms that

defendant would have received if convicted of the offenses charged, taking into account the usual principles of sentencing." *W.K.*, 159 *N.J.* at 6, 731 *A.*2d at 484. Further, N.J.S.A. 2C:4–8b(3) states that commitment of a defendant who has been acquitted by reason of insanity shall continue "during the maximum period of imprisonment that could have been imposed, as an ordinary term of imprisonment, for any charge on which the defendant has been acquitted by reason of insanity." AOC Directive # 9–96 also instructs trial court judges in criminal cases that in a *Krol* case where commitment has been ordered, the length of the commitment should be measured by the length of the maximum sentence that could have been imposed on any of the charges the defendant faced, "taking into account the usual principles of sentencing." *W.K.* at 5, 731 *A.*2d at 484.

G.K.'s interpretation of *W.K.* is such that in applying the "usual principles of sentencing" to her case, she would have been required to remain on *Krol* status for a period of seven (7) years. That figure is reached by determining the possible length of incarceration for the crime of second-degree aggravated arson and then, applying the usual principles of sentencing. The possible term of incarceration for such a crime would be five (5) to ten (10) years. Concurrent versus consecutive sentencing and merger are not issues here, as G.K. only faced one charge. However, G.K. argues that the definition of "usual principles of sentencing" includes the examination of the potential aggravating and mitigating circumstances as embodied in 2C:44–1(a) and (b). In G.K.'s case, examination of such circumstances would show that the only aggravating circumstance applicable to her case is number nine (9), the need to deter. Further, she contends that the following mitigating circumstances would apply:

-number four (4), that there were substantial grounds tending to excuse or justify the defendant's conduct, but they failed to establish a defense

-number seven (7), that the defendant has no prior criminal history

-number eight (8), that the defendant's conduct was a result of circumstances unlikely to recur, and

-number nine (9), that the character and attitude of the defendant indicate that it is unlikely she will commit another offense.

G.K. contends that if the court weighed these aggravating and mitigating circumstances, clearly the mitigating circumstances would outweigh the aggravating circumstances, and at most, a presumptive term of seven (7) years would have been entered. However, it should be noted, mitigating circumstance number four (4) would not apply in this case, as being found NGI *is* a defense to criminal behavior.

The State's interpretation of *W.K.* is much different. The State argues that *W.K.* does not apply in this case, as *W.K.* addresses a person who could have faced convictions on several charges, but in the case at bar, G.K. only faced one charge. The State further argues that a careful reading of *W.K.* reveals that the court's intentions were for a defendant's max out date to be the *maximum* term he or she could have been sentenced to for the most serious charge, not the presumptive term. Thus, the State's interpretation of *W.K.* is that the New Jersey Supreme Court intended a mechanical approach to *Krol* status determinations, ignoring the aggravating and mitigating circumstances and strictly applying the maximum term possible. It would seem that a "mechanical approach" is the antithesis of the phrase employed by our Supreme Court of "taking into account the usual principles of sentencing."

It had also come to this court's attention prior to the oral arguments that one of my colleagues rendered an opinion *In Matter of the Commitment of D.S.*, 359 *N.J.Super.* 28, 818 *A.*2d 368 (Law Div.2002). The undersigned respectfully disagrees with my esteemed colleague. The opinion in *D.S.* supports the argument made by the State in this case. In *D.S.*, the court held that although the Court in *W.K.* urges the trial courts to take into consideration the usual principles of sentencing, those principles are "limited to a consideration of merger principles and principles

of consecutive versus concurrent sentences." *In Matter of the Commitment of D.S.* at 33, 818 *A*.2d at 371.

Any difference of opinion on this matter results from how one defines "the usual principles of sentencing." It is this court's interpretation of the Supreme Court's use of the phrase "usual principles of sentencing" that it meant just that. So, what are the "usual principles of sentencing?" In this court's view, a determination of any possible merger of offenses, of any possible concurrent or consecutive terms, but also an examination and weighing of the applicable aggravating and mitigating circumstances, are some of the basic features in any sentencing proceeding. This court is unable to recall any sentencing where aggravating and mitigating circumstances were not examined and weighed against one another, both qualitatively and quantitatively.

Webster's dictionary defines 'usual' as, common, ordinary, customary, or regular. Clearly, the legislature intended the examination and balancing of aggravating and mitigating circumstances to become a part of the usual sentencing procedures. N.J.S.A. 2C:44-1 deals with the Criteria for Withholding or Imposing Sentence of Imprisonment. Section a, dealing with aggravating circumstances, states that the court "shall consider" those circumstances. Section b, on the other hand, dealing with mitigating circumstances, states that the court "may properly consider" the listed circumstances. Examination of the comments, which follow 2C:44-1 sheds some light on the issue. The comments describe 1978 meetings of the Assembly Judiciary Committee, which shifted the meaning of this particular section in that, "prior to that time its emphasis had been on withholding sentence of imprisonment." The end result, however, is that the court's are *required* to examine aggravating circumstances in determining a proper sentence, it is no longer within the discretion of the court.

Further, the comments in section 2 following 2C:43-2, Sentence in Accordance with the Code, spell out the specific steps to be taken by the court during sentencing. First, the trial court *must* consider all available sentencing alternatives. Next, the court

*must* determine whether a presumption of imprisonment or a presumption of non-imprisonment applies. This is determined by examining and weighing the applicable aggravating and mitigating circumstances as prescribed by 2C:44–1. After this is done, the court next must determine the length, if any, of incarceration.

In essence, the court should take into account any applicable aggravating and mitigating circumstances to determine a proper sentence. Clearly, if something *should* take place in the context of a sentencing proceeding, it falls under the umbrella of the word "usual". This court concludes, therefore, that the legislature intended to include the examination and balancing of aggravating and mitigating circumstances as part of what the New Jersey Supreme Court referred to as "the usual principles of sentencing". Further, if the Supreme Court had intended to limit the meaning of "usual principles of sentencing" to only merger and concurrent versus consecutive sentencing, as held in *In Matter of the Commitment of D.S.*, supra, it is likely the Court would not have used the word "usual". If the only points for analysis pursuant to "the usual principles of sentencing" were merger and concurrent/consecutive sentencing, in G.K.'s case there would be no analysis because she was only tried on the offense of second degree aggravated arson. Thus, our Supreme Court's intent, as applied to G.K., would be totally emasculated. This could not have been the intent of our Supreme Court in *W.K.* supra.

In the case of G.K., had she not been placed on *Krol* status, the court would have been required to determine a proper sentence for her for the crime of second degree aggravated arson, which carries a possible five (5) to ten (10) year term of incarceration. In doing so, the court would have been required to examine and balance any applicable aggravating and mitigating circumstances. Clearly, in G.K.'s case, the only applicable aggravating factor would be number nine (9), the need to deter from future violations of the law. Further, there would be multiple mitigating factors in G.K.'s favor, such as the fact that she had never had any prior contact with the criminal justice system. After the court exam-

ined all applicable factors, it would have been apparent that the mitigating factor's clearly outweighed the aggravating factor, therefore, the court would have sentenced G.K. to, at most, a seven (7) year term of incarceration, and very probably, a sentence less than seven (7) years.

Therefore, it is the opinion of this court that the proper interpretation of *W.K.* is that the practice of examining and balancing aggravating and mitigating circumstances is included in the Supreme Court's definition of the "usual principles of sentencing." Accordingly, when determining a *Krol* max out date, the court should take into consideration the following: any possible mergers of counts in the indictment, concurrent versus consecutive sentencing, as well as the balancing of any applicable aggravating and mitigating circumstances, and any other subjects within the concept "usual principles of sentencing."