# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3169-22[1]
A-2202-23

IN THE MATTER OF THE
COMMITMENT OF M.D.C.

_____

Argued January 8, 2025 – Decided March 12, 2025

Before Judges Rose, DeAlmeida and Puglisi.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 20-11-0855.

John Vincent Saykanic argued the cause for appellant M.D.C.

Edward F. Ray, Assistant Prosecutor, argued the cause for respondent State of New Jersey (Mark Musella, Bergen County Prosecutor, attorney; Edward F. Ray, of counsel and on the brief).

PER CURIAM

---

[1] By order dated August 22, 2024, we granted M.D.C.'s motion to consolidate these appeals. After oral argument, the parties stipulated the issues on appeal in A-3169-22 were moot. Therefore, that appeal is dismissed without prejudice and without fees and costs.

M.D.C. appeals from the March 20, 2024 Law Division order continuing his civil commitment at Greystone Park Psychiatric Hospital subject to Krol[2] status periodic review. We affirm.

I.

We summarize the facts and procedural history pertinent to this appeal from the record before the trial court. M.D.C. had a history of psychiatric hospitalizations and suicide attempts. In early 2020, M.D.C. was discharged to his mother's home from a psychiatric hospital. Prior to discharge, M.D.C. refused an injection of Abilify, an antipsychotic medication, and as a result, his insight deteriorated. M.D.C.'s mother initially cared for him at her home but eventually leased an apartment for him.

M.D.C.'s mother attempted to have him readmitted to a hospital because his mental stability deteriorated, but she was unable to do so because of COVID-19 pandemic restrictions. Instead, she stopped by his apartment twice daily to tidy up and ensure he had food. One evening after dinner, M.D.C. expressed a delusion that she was his enemy, but she didn't think it was "that bad."

The next day, on April 20, 2020, M.D.C. attacked his mother when she arrived at his apartment with his dinner. Believing she was trying to poison him,

---

[2] State v. Krol, 68 N.J. 236 (1975).

he struck her seven times in the head area, telling her, "I hope you die, bitch." A neighbor heard her crying for help and called 911. M.D.C. voluntarily stopped the attack, sat down, and waited for the police. When the police arrived, they found M.D.C.'s mother on the floor "with serious injuries to her face and head," including signs M.D.C. "attempted to or did strangle" her.

M.D.C.'s mother was transported via ambulance to the hospital for treatment. She was diagnosed with a concussion and was kept for observation for two-and-one-half days. She denied any ongoing complications or disability from the assault and, although she was unable to recall any events after she gave M.D.C. his dinner, maintained it was not a "major" assault.

On November 17, 2020, a grand jury indicted M.D.C. for first-degree attempted murder, N.J.S.A. 2C:5-1 and :11-3; and second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1).

The trial court found M.D.C. competent to stand trial. On January 27, 2021, after considering evidence to which the parties stipulated and a physician's report, the court found M.D.C. not guilty by reason of insanity (NGRI) and placed him on supervision and review status pursuant to Krol and State v. Fields, 77 N.J. 282 (1978). The court ordered M.D.C. committed to the custody of the Commissioner of the Department of Human Services for transfer to an

appropriate institution to determine whether he continued to pose a danger to self, others or property as a result of his mental illness, and for treatment. The court also ordered a maximum period of commitment or supervision of twenty years, less jail credit.

During the first four review hearings, the Krol judge considered testimony of the State's psychiatric experts. They recounted M.D.C.'s continuing delusions, in which he believed the Central Intelligence Agency (CIA), Federal Bureau of Investigation (FBI) and the Roman Catholic Church were attempting to recruit him to use his special telepathic abilities, which included the ability to infect people with over 150,000 different types of diseases. He believed his mother had already been co-opted by the church, so he did not trust her and became distressed when she visited. M.D.C. also believed he would face assassination attempts upon his discharge from Greystone, so he contemplated hiring assassins from a street gang to protect him.

M.D.C.'s treatment at Greystone included medication and group therapy. He disagreed with his diagnoses and believed he had post-traumatic stress disorder (PTSD), which his treating psychiatrists had ruled out. M.D.C. was initially prescribed Abilify but his delusional thoughts continued so his medication was switched to clozapine. Although he reacted positively to

4

clozapine, he required an increase in dosage because the delusions persisted. M.D.C. was compliant with his prescribed medications but believed he should treat his perceived PTSD with cannabis and hallucinogenic drugs such as psilocybin and ayahuasca. Although M.D.C.'s treating psychiatrist believed these drugs might exacerbate the delusions, M.D.C. intended to seek treatment with a private psychiatrist who would prescribe him medical marijuana and other psychedelic-based treatments.

Even on the higher dosage of clozapine, M.D.C.'s delusions remained similar to those he reported in the past. He did not think the CIA, the FBI or the Roman Catholic Church could harm him while he was at Greystone, but once he was outside, believed they would "get him." M.D.C. also continued to think his mother was working with the CIA or the Roman Catholic Church to poison and kill him.

M.D.C. also mailed to the judge a fifteen-page letter dated February 13, 2023, in which he detailed his personal, educational, medical and psychiatric history. The letter is rife with delusional thoughts that clandestine organizations and individuals threatened him, in addition to his beliefs his mother poisoned him. He explained he refused injectable Abilify because the medication prevented him from communicating with God, angels and demons. He also

5

suggested the judge hold a trial in a "secret court where the clandestine groups can be talked about."

The Krol hearing on appeal took place on March 11, 2024, during which the judge considered testimony from three stipulated experts. Ritesha Krishnappa, M.D., an expert in the field of psychiatry, testified on the State's behalf. Catherine M. Barber, Ph.D., and David J. Gallina, M.D., P.A., experts in the fields of psychology and psychiatry, respectively, testified on M.D.C.'s behalf.

Dr. Krishnappa reiterated M.D.C.'s diagnoses of depressive type schizoaffective disorder, anxiety disorder, cannabis use disorder in sustained remission in a controlled environment, and hallucinogen use disorder in sustained remission in a controlled environment. He listed M.D.C.'s prescriptions and reported M.D.C. was medication compliant.

Dr. Krishnappa stated M.D.C. reported fewer hallucinations since transitioning to clozapine. For example, M.D.C. no longer expressed he had telepathic abilities to communicate with the CIA, FBI, the Roman Catholic Church, the Pope, God and his ex-wife. Dr. Krishnappa explained that the medication did not make M.D.C. believe he did not have telepathic abilities; rather, he thought his telepathic abilities were inhibited as a side effect of the

medication. As the doctor explained, "that [was] . . . one of multiple reasons he . . . made requests to . . . stop the clozapine or—indicat[ed] that he does not need it."

Dr. Krishnappa also testified M.D.C.'s beliefs about assassination attempts on him had "shifted and he believes that those above these individuals have told them to stand down and that his life was not in danger. But at the same time, he has also said that . . . he's okay with dying if they do decide to kill him." Dr. Krishnappa found M.D.C.'s expressions "a bit concerning in terms of safety of self, that he's willing to accept that."

M.D.C. also continued to express paranoia toward his mother. Because M.D.C. believed his mother would try to poison him, he would not consume any foods she brought him that were not prepackaged or "witness[ed]" by him. He also would not wear clothing that had been in his mother's possession because he believed she might have contaminated the items with transdermal poisons. After discharge, M.D.C. intended to only meet his mother in public places because he maintained the belief she still had intent to harm him. Dr. Krishnappa noted M.D.C.'s fear of poisoning was "a significant component" of his attack on his mother, along with a history of conflict with her.

A-3169-22

Dr. Krishnappa acknowledged M.D.C.'s delusions may not completely resolve. He viewed the "point of determination" for discharge as whether M.D.C. appropriately interpreted those delusions, and that his interpretation "would not affect his interactions and behaviors with his mother or any other member of the community." He noted hospital treatment team members "have become intertwined into his delusions and [his delusions] have impacted his interactions with them."

The doctor again testified M.D.C. lacked insight into his mental illness. If M.D.C. were discharged into the community, he still intended to seek out a psychiatrist who would discontinue his medications and prescribe him the medications he believed he should be taking, which would potentially exacerbate his symptoms.

M.D.C. participated in group cognitive behavioral therapy at Greystone but continually declined to engage in individual therapy. Since the previous hearing, he "manage[d] to do well" in four or five "very short excursions into the community" with staff.

Dr. Krishnappa believed the next step towards M.D.C.'s discharge was to transition him to the cottages, "a setting within the hospital, on the hospital grounds, which closely mimics a group home setting." The cottages had

8

constant supervision, and staff could evaluate M.D.C.'s readiness for transition to the community.

Finally, Dr. Krishnappa opined that, within a reasonable degree of psychiatric certainty, M.D.C. continued to be substantially likely to pose a danger to himself or others within the foreseeable future.

M.D.C.'s forensic psychologist, Dr. Barber, testified next. She interviewed M.D.C. on two days in September 2023 and prepared a risk assessment dated December 10, 2023. Dr. Barber employed the Historical Clinical and Risk Management-20 (HCR-20), what she termed the "gold standard" clinical assessment, to determine M.D.C.'s current and prospective risk factors. She concluded M.D.C. was "between moderate and low risk of violence toward his mother," which she believed would be manageable if M.D.C. were gradually stepped down to a less restrictive alternative setting to continue his treatment. She believed his overall risk to the community was low.

Dr. Barber also concluded M.D.C.'s attack on his mother might not have been caused by his delusions. Rather, M.D.C. "didn't want to eat her food. . . . [and] he felt his mother was being intrusive. He just wanted to be left alone. And he felt that she was trying to dominate him, take control of . . . his coming and going, his activities, his eating."

While M.D.C. still continued to exhibit paranoid ideas about his mother, Dr. Barber found he was "far less reactive to them than he once was." Although Dr. Krishnappa testified M.D.C. would not accept food from his mother as recently as one month before the hearing, Dr. Barber did not believe that was "central to the determination of whether he is or is not likely to commit any type of violence toward her."

M.D.C. reported to Dr. Barber he used hallucinogenic substances in the past and had made homemade ayahuasca. She noted M.D.C. disagreed with Dr. Krishnappa about his diagnoses and which medications he should take. Dr. Barber acknowledged Abilify "wasn't efficacious in reducing his symptoms" before, but M.D.C. was medication compliant and knew he needed to continue with "some" medication regimen.

Dr. Barber opined M.D.C.'s disagreement with his treatment providers did not render him dangerous. She believed if M.D.C. were to stop his antipsychotic medications, it would "not necessarily" increase his potential dangerousness to the community. She also thought M.D.C. might still take his medication even though he thought he did not need it.

A-3169-22

Dr. Barber did not believe M.D.C. was ready to be released to the community, but agreed he should be transferred to the cottages, which was "really the only reasonable or plausible movement for him."

Dr. Gallina then testified. He examined M.D.C. and determined he was not a danger to himself or others and has improved, even though he continued to exhibit paranoid thoughts. Dr. Gallina believed M.D.C.'s baseline for delusional symptoms would not likely improve dramatically, but M.D.C. was aware he needed to avoid aggressive behavior with his mother.

Dr. Gallina did not believe the hospital was the least restrictive option for M.D.C., and opined M.D.C. should live in a group home with "a good degree of supervision" "for a period of time," in part, to ensure medication compliance. Dr. Gallina had no objection to M.D.C.'s transfer to the cottages, but noted they were "still a very restrictive environment," "in a locked facility . . . very similar to being in a hospital, only on the grounds . . . in a smaller structural facility." Dr. Gallina recommended that "consideration be given for [M.D.C.] . . . to move into a community environment that is supervised and an appropriate and less restrictive one."

A-3169-22

M.D.C.'s mother believed he should receive individual therapy outside the hospital, which would mirror aspects of his previous treatment in the community.

Following summations, the judge issued an oral decision, thoughtfully reflecting his consideration of the testimony and documentary evidence. As to Dr. Krishnappa's testimony, the judge noted:

> Again, I've heard his testimony before in this matter. He's treated M.D.C. for quite some time. And the impression I got from Dr. Krishnappa's report and his testimony is although M.D.C. . . . is doing better in treatment, his concerns are primarily that . . . M.D.C. is reluctant to take certain medication and also that . . . he's compliant with his medication. Let me specify.
>
> [M.D.C.] continues to believe that he does not need antipsychotic medications and that they diminish his telepathic abilities, which he does not like. And again, I think that that is a large part of his concern with . . . M.D.C. Also, the delusions—which again seems to be accepted by all three witnesses that M.D.C. does suffer from delusions, the issue is . . . does he remain a threat to himself or others based on his mental illness.
>
> The court also heard the testimonies of Dr. Barber and Dr. Gallina. Dr. Barber is an expert in the field of psychology. Her report is labeled as a risk assessment to determine . . . what risk, if any, M.D.C. would pose . . . regarding his relationship with his mother. And her conclusion is that . . . M.D.C. is a moderate to low risk of . . . committing a violent act towards his mother and that she also favors the gradual re-acclimation of M.D.C. into the community and that

12

the mere fact that he suffers from delusions does not, in and of itself, make him a threat . . . of violence.

And then finally, again, I heard from Dr. Gallina. Dr. Gallina has testified in this case . . . before. And Dr. Gallina's testimony also mirrors that there is a less restrictive but appropriate environment that M.D.C. could be treated in other than the hospital. . . . [I]n response to the State's cross-examination question, . . . he would have no objection to M.D.C. being transitioned to the cottages, that there is still a very restrictive environment where he could be monitored and treated.

The judge expressed that he "remain[ed] concerned." He noted that "no one [wa]s advocating for . . . M.D.C. to be immediately released from the hospital[,] . . . the general consensus [wa]s that it should be a gradual[] . . . reacclimation. And [he didn't] hear any difference of opinion on that fact." The judge found, based primarily on Dr. Krishnappa's report, that the State proved by a preponderance of the evidence M.D.C. suffered from a mental illness such that he posed a danger to himself or others in the community in a less restrictive setting. Thus, the judge continued M.D.C.'s commitment on Krol status, but determined the cottages at Greystone were "a restrictive enough setting" where M.D.C. "could be monitored and treated," and ordered him transferred to the

cottages as soon as possible.[3] The next review date was scheduled in three months.

On appeal, M.D.C. argues he should be discharged from Krol status or immediately transferred to a group home in the community because the Krol judge's order was a clear abuse of discretion, as M.D.C. is no longer a danger to himself or others as a result of mental illness.

II.

We are guided by well-settled principles of law that govern a Krol review hearing of an NGRI commitment. A judge's determination is "subject to modification on appeal only where the record reveals a clear abuse of discretion." In re Civ. Commitment of J.M.B., 395 N.J. Super. 69, 90 (App. Div. 2007). Judges who hear commitment cases "generally are 'specialists' and 'their expertise in the subject' is entitled to 'special deference.'" In re Civ. Commitment of R.F., 217 N.J. 152, 174 (2014) (quoting In re Civ. Commitment of T.J.N., 390 N.J. Super. 218, 226 (App. Div. 2007)). To the extent the questions presented are procedural or legal ones, however, our review is de novo. In re Commitment of J.L.J., 196 N.J. Super. 34, 49 (App. Div. 1984).

---

[3] The March 20, 2024 order continued M.D.C. on Krol status and "discharged" him to the cottages. On April 9, 2024, the court issued an amended order requiring M.D.C. to be "transferred" to the cottages.

Appellate review of a <u>Krol</u> order is "extremely narrow, with the utmost deference accorded the reviewing judge's determination as to the appropriate accommodation of the competing interests of individual liberty and societal safety in the particular case." <u>Fields</u>, 77 N.J. at 311. Our Supreme Court has held "[s]uch sensitive decisions will be subject to appellate modification only where the record reveals a clear mistake in the exercise of the reviewing judge's broad discretion in evaluating the committee's present condition and formulating a suitable order." <u>Ibid.</u> "Accordingly, it is our responsibility to canvass the record inclusive of the expert testimony to determine whether the findings made by the trial judge were clearly erroneous." <u>J.M.B.</u>, 395 N.J. Super. at 90 (citing <u>In re D.C.</u>, 146 N.J. 31, 58-59 (1996)).

"We give deference to the findings of our trial judges because they have the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" <u>R.F.</u>, 217 N.J. at 174 (quoting <u>State v. Johnson</u>, 42 N.J. 146, 161 (1964)). "So long as the trial court's findings are supported by 'sufficient credible evidence present in the record,' those findings should not be disturbed." <u>Id.</u> at 175 (quoting <u>Johnson</u>, 42 N.J. at 162). We review expert testimony in the record for credible evidence to support the judge's

fact-findings before determining those findings were clearly erroneous. See D.C., 146 N.J. at 58-59.

When an accused is found NGRI, the criminal proceedings terminate "unless the accused remains mentally ill and in need of involuntary commitment." In re Commitment of W.K., 159 N.J. 1, 4 (1999). Following an NGRI verdict, "the accused can be involuntarily committed," and thereafter, the court must conduct "periodic review hearings," known as Krol hearings, "to determine if continued involuntary commitment is warranted." Ibid.

An NGRI defendant "may be held in continued confinement if the person is a danger to self or others and is in need of medical treatment." Id. at 2. The purpose is not to punish, but "to protect society against individuals who, through no culpable fault of their own, pose a threat to public safety." Krol, 68 N.J. at 246. After commitment, NGRI defendants "are reviewed on a periodic basis under the same standards as those applied to civil commitments generally." In re Commitment of M.M., 377 N.J. Super. 71, 76 (App. Div. 2005) (citing Krol, 68 N.J. at 251). An NGRI defendant "may remain under Krol commitment for the maximum ordinary aggregate terms that defendant would have received if convicted of the offenses charged, taking into account the usual principles of sentencing." W.K., 159 N.J. at 6.

To continue involuntary commitment, the State must establish a defendant poses "a substantial risk of dangerous conduct within the reasonably foreseeable future."  M.M., 377 N.J. Super. at 76 (quoting Krol, 68 N.J. at 260).  The focus is on whether the defendant "presently poses a significant threat of harm, either to himself or to others."  Ibid. (quoting Krol, 68 N.J. at 247).  The determination of "dangerousness" is "a legal one, not a medical one."  Krol, 68 N.J. at 261.  An "[e]valuation of the magnitude of the risk involves consideration both of the likelihood of dangerous conduct and the seriousness of the harm which may ensue if such conduct takes place."  Id. at 260.

N.J.S.A. 30:4-27.2(h) defines danger to self as:  "by reason of mental illness the person has threatened or attempted suicide or serious bodily harm, or has behaved in such a manner as to indicate . . . that it is probable that substantial bodily injury, serious physical harm, or death will result within the reasonably foreseeable future."  A danger to others is defined as:  "by reason of mental illness there is a substantial likelihood that the person will inflict serious bodily harm upon another person or cause serious property damage within the reasonably foreseeable future."  N.J.S.A. 30:4-27.2(i).  The required review for a "[d]etermination of dangerousness involves prediction of defendant's future conduct rather than mere characterization of . . . past conduct."  Krol, 68 N.J. at

A-3169-22

260-61. Yet, a "defendant's past conduct is important evidence as to his probable future conduct." Id. at 261. As the statute directs, the dangerousness determination "shall take into account a person's history, recent behavior, and any recent act, threat, or serious psychiatric deterioration." N.J.S.A. 30:4-27.2(h), (i).

The determination requires a "delicate balancing of society's interest in protection from harmful conduct against the individual's interest in personal liberty and autonomy." Krol, 68 N.J. at 261. In ordering restraints to reduce the risks an NGRI defendant poses, any "[d]oubts must be resolved in favor of protecting the public, but the court should not, by its order, infringe upon defendant's liberty or autonomy any more than appears reasonably necessary to accomplish this goal." State v. Ortiz, 193 N.J. 278, 292 (2008) (quoting Krol, 68 N.J. at 261).

## III.

We conclude the Krol judge's finding that M.D.C. has a mental illness as he suffers from depression and delusional disorder, is supported by sufficient credible evidence in the record. We are unpersuaded by M.D.C.'s contention he should no longer be subject to Krol supervision. Dr. Krishnappa testified as to M.D.C.'s diagnoses and continued delusional thinking, which was not disputed.

18

The experts agreed the delusions may persist even with increased medication, as demonstrated by M.D.C.'s continued ideas about his mother. While the experts disagreed as to the extent the delusions contributed to M.D.C.'s assault of her, his disordered thinking remained a risk factor for her safety. These concerns are heightened when viewed in light of M.D.C.'s lack of insight into his mental illness, persistent resistance to efficacious medication, and his post-release intentions.

Dr. Barber testified she found M.D.C.'s risk to his mother to be moderate to low, and his risk to the community to be low, and Dr. Gallina testified M.D.C. did not exhibit any indication he was a danger to himself or others. However, the issue of dangerousness, as a factor in the "delicate balancing of society's interest in protection from harmful conduct against the individual's interest in personal liberty and autonomy," is ultimately legal, not medical. Krol, 68 N.J. at 261. Having reviewed the experts' testimony and assessments, we are unpersuaded the judge's reliance on the evaluation and opinion of Dr. Krishnappa, who had been treating M.D.C. "for quite some time," was clearly erroneous.

In addition, as the judge pointed out, both the State's and M.D.C.'s experts testified the next move for him should be a transfer to the cottages to begin a

gradual re-acclimation to the community. Neither Dr. Krishnappa nor Dr. Barber believed M.D.C. was ready for release into the community, and although Dr. Gallina opined the cottages were too restrictive, he did not disagree with the recommendation to move him there. We discern no abuse of discretion in the judge's decision, which is consistent with our Supreme Court's edict that "the relaxation of the restraints on the committee's liberty must proceed in gradual stages." Fields, 77 N.J. at 303.

A-2202-23 is affirmed; A-3169-22 is dismissed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division